FILED

2010 AUG 26   P 2: 16

CIVIL DISTRICT FOR THE PARISH OF ORLEANS CIVIL
STATE OF LOUISIANA   DISTRICT COURT

NO. 2010-4340                    DIVISION "D"                    SECTION "16"

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED:_____        _____

DEPUTY CLERK

## PEREMPTORY EXCEPTION OF NO CAUSE OF ACTION

NOW INTO COURT, through undersigned counsel, comes BAC Home Loans Servicing,

L.P. ("Bank of America"), which respectfully submits this Peremptory Exception of No Cause of

Action, seeking dismissal of all claims alleged in the Petition to Annul Sheriff's Sale and For

Damages and in the Amended Petition to Annul Sheriff's Sale and For Damages (collectively,

the "Petition") filed by Plaintiff Frederick Thomas, with prejudice, pursuant to Louisiana Code

of Civil Procedure article 927.   For the reasons more fully explained in the accompanying

Memorandum in Support, Plaintiff's causes of action alleged in the Petition are barred under the

Louisiana Credit Agreement Statute, Louisiana Revised Statutes 6:1121, *et seq.*   Therefore, the

Petition fails to state a cause of action upon which relief can be granted and should be dismissed,

with prejudice.

Respectfully submitted,

*Laura C. Settlemyer*

DANIEL T. PLUNKETT (#21822)
LAURA C. SETTLEMYER (#32243)
McGlinchey Stafford, PLLC
12th Floor, 601 Poydras Street
New Orleans, LA 70130
Telephone (504) 586-1200

ATTORNEYS FOR BAC HOME LOANS
SERVICING, L.P.

885791.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon all counsel of record by electronic transmission or by depositing same in the U.S. Mail, postage prepaid and properly addressed, this _27th_ day of August, 2010.

_Laura C. Settlemyer_
LAURA C. SETTLEMYER

FILED

2010 AUG 26 P 2: 16

CIVIL
DISTRICT COURT

CIVIL DISTRICT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2010-4340                         DIVISION "D"                         SECTION "16"

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED:_____          _____

                                        DEPUTY CLERK

## MEMORANDUM IN SUPPORT OF PEREMPTORY EXCEPTION OF NO CAUSE OF ACTION

NOW INTO COURT, through undersigned counsel, comes BAC Home Loans Servicing, L.P. ("Bank of America"), which respectfully submits this Memorandum in Support of its Peremptory Exception of No Cause of Action, which seeks the dismissal of all claims in the Petition to Annul Sheriff's Sale and For Damages and in the Amended Petition to Annul Sheriff's Sale and For Damages (collectively, the "Petition") filed by Plaintiff Frederick Thomas, with prejudice, pursuant to Louisiana Code of Civil Procedure article 927.

## I.    FACTUAL ALLEGATIONS

For the purposes of this peremptory exception only, Bank of America accepts as true, without waiving any defenses or objections thereto, the allegations contained in the Petition.

Plaintiff has sued Bank of America to attempt to undo a judicial foreclosure sale based on an alleged oral agreement by Bank of America to postpone the sale.  Plaintiff and his brother took over the payments to Bank of America under a loan (the "Loan") secured by a mortgage on their home (the "Mortgage") in late 2008.  Am. Pet. at ¶ XVI.  At some time during 2008, Plaintiff and his brother repeatedly fell behind in their payments. Am. Pet. at ¶ XVIII.  Plaintiff contacted Bank of America regarding a possible loan modification.  Am. Pet. at ¶ XXI.  The Petition does not allege that Plaintiff or his brother caught up on the missed payments or that they continued making payments.

To enforce its rights under the Loan and the Mortgage, Bank of America filed a Petition for Executory Process on September 8, 2009.  Am. Pet. at ¶ XXXII.  A Writ of Seizure and Sale was issued on September 17, 2009 (Am. Pet. at ¶ XXXIV), and the Sheriff's sale was scheduled

885420.1

for November 19, 2009. Am. Pet. at ¶ XXXV. Plaintiff does not allege that there were any procedural defects in the executory process.

While Plaintiff's loan modification application was pending, Bank of America agreed to postpone the sale, first to January 21, 2010, then to March 4, 2010, and finally a third time to April 22, 2010. Am. Pet. at XXXV. On April 12, 2010, Plaintiff called Bank of America and was allegedly told that his application for a loan modification was still pending and that Bank of America would likely postpone the sale again. Am. Pet. at ¶ XXXVIII.

By April 20, 2010, however, Plaintiff had not received anything in writing from Bank of America. Am. Pet. at ¶ XXXIX. Plaintiff called Bank of America again and spoke with a Loss Mitigation representative. Am. Pet. at ¶ XL. This representative informed Plaintiff that his loan modification application had been denied but that he could reapply by calling the next day, April 21, 2010. Am. Pet. at ¶¶ XL, XLII. Plaintiff called Bank of America on April 21, 2010, and asked to reapply for a loan modification. Am. Pet. at ¶ XLIII. The representative allegedly told him that he pre-qualified and that she would send a message to Bank of America's attorneys to stop the Sheriff's sale scheduled for April 22, 2010. Am. Pet. at ¶ XLIV.

The property, however, was sold at the Sheriff's sale as scheduled. Am. Pet. at ¶ L. Bank of America purchased the property. Am. Pet. at ¶ L.

Plaintiff alleges that his legal rights were deprived because he was told that the sale would probably be delayed and, later, that the attorneys would be notified to stop the sale. Am. Pet. at ¶ LI. He does not allege that there were any procedural defects related to the Sheriff's sale.

Even though Plaintiff was allegedly told over the telephone that the sale would likely be postponed and that the attorneys would be notified to stop the sale, he does not allege that he and Bank of America agreed to anything in writing. *See* Am. Pet. Plaintiff does not contest any other procedural or substantive aspect of the April 22, 2010 Sheriff's sale. *See* Am. Pet.

## II.   LAW AND ARGUMENT

### A.   This exception should be granted because Plaintiff is not legally entitled to the relief he seeks.

The peremptory exception of no cause of action tests the legal sufficiency of a petition by determining whether the law affords a remedy on the facts alleged in the pleading. *See* La. Code Civ. Proc. art. 927(A)(4); *Everything on Wheels Subaru, Inc. v. Subaru S., Inc.*, 616 So. 2d 1234, 1235 (La. 1993); *Darville v. Texaco, Inc.*, 447 So. 2d 473, 474-75 (La. 1984). The exception must be tried on the face of the plaintiff's pleadings and no evidence may be introduced to support or controvert the objection that the petition fails to state a cause of action. La. Code Civ. Proc. art. 931. Thus, the only issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. *Everything on Wheels*, 616 So. 2d at 1235.

### B.   The Louisiana Credit Agreement Statute prohibits the relief sought in the Petition.

The Louisiana Credit Agreement Statute, Louisiana Revised Statutes 6:1121, *et seq.*, expressly prohibits actions against a creditor based on an oral credit agreement. *See* La. R.S. 6:1122; *Whitney Nat'l Bank v. Rockwell*, 94-3049 (La. 10/16/95); 661 So. 2d 1325, 1331. Section 6:1122 expressly prohibits an action "against a creditor based upon an oral agreement unless the agreement is in writing, expresses consideration, sets forth relevant terms and conditions, and is signed by the creditor and the debtor." *Jesco Constr. Corp. v. Nationsbank Corp.*, No. 02-0057, p. 3 (La. 10/25/02); 830 So. 2d 989, 991.

Plaintiff's Petition seeks relief based on an oral credit agreement by his creditor, Bank of America. Such relief is expressly prohibited under the Louisiana Credit Agreement Statute.

#### i.   <u>The statements made by employees of Bank of America constitute an oral credit agreement.</u>

A "credit agreement" is defined as "an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation." La. R.S. 6:1121(1). Under the Credit Agreement Statute, an action cannot be maintained on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor. La. R.S. 6:1122.

Additionally, the statutes expressly provide that an action cannot be maintained on an agreement to forbear from exercising remedies under an earlier credit agreement unless the agreement to forbear satisfies the requirements of Section 6:1122.  La. R.S. 6:1123(B).

Here, the statements made over the telephone to Plaintiff, allegedly promising that the Sheriff's sale would be postponed, concern a forbearance from exercising remedies under the Loan and the Mortgage, which are earlier credit agreements.  Therefore, any agreement between Plaintiff and Bank of America must satisfy the requirements of Section 6:1122 to be enforceable. Because Plaintiff does not allege that any agreement was made in writing, the statements made over the telephone are unenforceable oral credit agreements.

**ii.  Each of Plaintiff's theories of recovery based on an oral credit agreement is barred.**

Each of Plaintiff's causes of action is barred under the Credit Agreement Statute.  All actions, causes of action, and theories of recovery based upon an oral credit agreement are barred by Section 6:1122.  *Jesco*, 830 So. 2d at 992.

The Supreme Court held in *Jesco Construction Corp. v. Nationsbank Corp.* that the Credit Agreement Statute precludes all actions for damages arising from oral credit agreements, regardless of the legal theory of recovery asserted.  *Id.*  The matter in *Jesco* arose from a failed loan application in which the plaintiff alleged that the creditor had orally indicated that the loan was approved, that the transaction would be complete by the end of the following week, and that the loan was a "done deal."  *Id.* at 990-91.  The loan application, however, was denied.  *Id.* at 990.  The plaintiff filed suit against the creditor alleging breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty.  *Id.* at 991.  On appeal, the United States Fifth Circuit Court of Appeals certified the following question to the Louisiana Supreme Court: "whether the Louisiana Credit Agreement Statute precludes all actions for damages arising from oral credit agreements, regardless of the legal theory of recovery."  *Id.* at 990.  The Louisiana Supreme Court answered affirmatively.  *Id.*

Each of Plaintiff's causes of action here (nullity of Sheriff's sale, wrongful foreclosure, equitable estoppel, abuse of rights doctrine, breach of the implied covenant of good faith,

negligent infliction of emotional distress, and failure to mitigate damages) is based on an oral credit agreement. Therefore, as the Supreme Court held in *Jesco*, all of Plaintiff's causes of action are expressly barred by the Credit Agreement Statute.

## III.   CONCLUSION

Because Plaintiff's claims are barred by the Louisiana Credit Agreement Statute, the Petition fails to state a cause of action and therefore must be dismissed. Even accepting all of the allegations in the Petition as true, none of the statements made over the telephone by Bank of America employees were reduced to writing. The telephone statements constitute oral credit agreements, and actions based on oral credit agreements are expressly barred under the Louisiana Credit Agreement Statute. The Petition should therefore be dismissed, with prejudice, for failure to state a cause of action.

Respectfully submitted,

*Laura C. Settlemyer*

DANIEL T. PLUNKETT (#21822)
LAURA C. SETTLEMYER (#32243)
McGlinchey Stafford, PLLC
12th Floor, 601 Poydras Street
New Orleans, LA 70130
Telephone (504) 586-1200

ATTORNEYS FOR BAC HOME LOANS
SERVICING, L.P.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon all counsel of record by electronic transmission or by depositing same in the U.S. Mail, postage prepaid and properly addressed, this 27th day of August, 2010.

*Laura C. Settlemyer*

LAURA C. SETTLEMYER

FILED

CIVIL DISTRICT FOR THE PARISH OF ORLEANS 2010 AUG 26 P 2: 16

STATE OF LOUISIANA

NO. 2010-4340                    DIVISION "D"                    SECTION "16"

CIVIL
DISTRICT COURT

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED:_____    _____
                                        DEPUTY CLERK

## RULE TO SHOW CAUSE

Considering the foregoing Peremptory Exception of No Cause of Action filed by BAC

Home Loans Servicing, L.P.,

**IT IS ORDERED** that Plaintiff, Frederick Thomas, appear and show cause, if any there

be, why the Peremptory Exception of No Cause of Action filed by BAC Home Loans Servicing,

L.P. should not be granted, on the 15th day of Oct, 2010 at 9 o'clock

A.m..

New Orleans, Louisiana, this 30 day of August, 2010.

(Sgd) Lloyd J. Medley, Jr.

_____

**JUDGE, CIVIL DISTRICT COURT**

## SERVICE INFORMATION:

Defendant, BAC Home Loans Servicing, L.P.,
will serve **Plaintiff, Frederick Thomas,**
through his counsel of record, Lauren E. Bartlett and David H. Williams,
with this Rule to Show Cause via certified mail,
return receipt requested, pursuant to La. C.C.P. art 1313.

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.

# SOUTHEAST LOUISIANA LEGAL SERVICES

1010 Common St., Suite 1400A
New Orleans, Louisiana 70112
Phone: (504) 529-1000  Fax: (504) 529-1009
Web Address: www.slls.org

**Lauren E. Bartlett**
**Staff Attorney**

**Direct Line:**     (504) 529-1000 Ext. 271
**Email:**            lbartlett@slls.org

VIA US MAIL

September 13, 2010

Laura Settlemyer
McGlinchey Stafford PLLC
PO Box 60643
New Orleans LA 70160-0643

Re:    **Loan No.**            **100045629**
       **Borrower:**          **Emanuel and Frederick Thomas (Estate of Clarence Thomas)**
       **Property address:**  **821-823 N. Dupre St.**
                              **New Orleans, LA 70119**
       *Frederick Thomas v. BAC Home Loans Servicing, L.P.*, CDC Case No. 2010-4340

Dear Laura:

    As you know, this office represents Mr. Frederick Thomas in regards to the above-captioned case. Enclosed please find our Unopposed Motion to Continue Rule to Show Cause Hearing which was filed in court today.

    Please call me with questions at (504) 529-1000 Ext. 271.

                              Sincerely,

                              Lauren E. Bartlett
                              Staff Attorney, Foreclosure Prevention Unit

     A Partner

FILED

SEP 13 A 11:47

ORLEANS PARISH CIVIL DISTRICT COURT
STATE OF LOUISIANA CIVIL
DISTRICT COURT

No.  10-4340

Division: N
Section: 8

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED _____

_____
DEPUTY CLERK

*IN FORMA PAUPERIS*

## UNOPPOSED MOTION TO CONTINUE RULE TO SHOW CAUSE HEARING

NOW INTO COURT through undersigned counsel comes Plaintiff, Frederick Thomas, who hereby moves to continue the hearing set for October 15, 2010, to a later date.  Counsel for Mr. Thomas has contacted counsel for BAC Home Loans Servicing, L.P. who indicated they are agreeable to continue the hearing.

Respectfully submitted,

SOUTHEAST LOUISIANA LEGAL SERVICES

By: _____Bartlett_____
LAUREN E. BARTLETT, LSBA Bar No. 31573
1010 Common Street, Suite 1400A
New Orleans, Louisiana  70112
Telephone: (504) 529-1000, ext. 271
Fax: (504) 529-1009

Attorney for Petitioner Frederick Thomas.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record by electronic transmission or by depositing the same in the U.S. mail, properly addressed and postage prepaid, this 13th day of September, 2010.

_____Bartlett_____
LAUREN E. BARTLETT

1

**ORLEANS PARISH CIVIL DISTRICT COURT**
**STATE OF LOUISIANA**

No.  10-4340                                              Division: N
                                                          Section: 8

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED _____        _____
                                                **DEPUTY CLERK**

<u>**ORDER**</u>

    Considering Plaintiff's Unopposed Motion to Continue Rule to Show Cause Hearing,

        IT IS ORDERED that the hearing scheduled for October 15, 2010 be continued to

the _____ day of _____, 2010 at _____ o'clock a.m.


                    _____
                                JUDGE


2

# SOUTHEAST LOUISIANA LEGAL SERVICES

1010 Common St., Suite 1400A
New Orleans, Louisiana 70112
Phone: (504) 529-1000  Fax: (504) 529-1009
Web Address: www.slls.org

| | | |
|---|---|---|
| **Lauren E. Bartlett** | **Direct Line:** | **(504) 529-1000 Ext. 271** |
| **Staff Attorney** | **Email:** | **lbartlett@slls.org** |

VIA US MAIL

October 27, 2010

Laura Settlemyer
McGlinchey Stafford PLLC
PO Box 60643
New Orleans LA 70160-0643

Re:  **Loan No.         100045629**
**Borrower:        Emanuel and Frederick Thomas (Estate of Clarence Thomas)**
**Property address:   821-823 N. Dupre St.**
**New Orleans, LA 70119**
*Frederick Thomas v. BAC Home Loans Servicing, L.P.*, **CDC Case No. 2010-4340**

Hi Laura,

Each of the following Interrogatories, Requests for Production of Documents and Requests for Admission are to be answered separately and fully, in writing and under oath, within fifteen (15) days after service of the requests, by 5 p.m. on Thursday November 11, 2010 at the offices of Southeast Louisiana Legal Services, 1010 Common Street, Suite 1400A, New Orleans, Louisiana.

Thanks,

*Bartlett*

Lauren E. Bartlett
Staff Attorney
Southeast Louisiana Legal Services
(formerly New Orleans Legal Assistance)
1010 Common St., Suite 1400A
New Orleans, LA 70112
Tel: (504) 529-1000 ext. 271
Fax: (504) 529-1009 or (504) 596-2241

 LSC

 United Way    A Partner

ORLEANS PARISH CIVIL DISTRICT COURT
STATE OF LOUISIANA

No. 10-4340                                          Division: D
                                                    Section: 16

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED _____      _____
                                              DEPUTY CLERK

## PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS, INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

To:    Defendant BAC HOME LOANS SERVING, L.P. through its attorney of record,

Laura Settlemyer
McGlinchey Stafford, PLLC
12th Floor, 601 Poydras
New Orleans, LA 70130

Please note: the term "Defendant" as used herein refers to the legal entity which filed the Peremptory Exception of No Cause of Action on August 26, 2010. The term "Plaintiff" refers to Frederick Thomas.

Plaintiff hereby propounds the following Interrogatories, Requests for Production of Documents and Requests for Admissions pursuant to the Louisiana Code of Civil Procedure. Each of the following Interrogatories, Requests for Production of Documents and Requests for Admission are to be answered separately and fully, in writing and under oath, within fifteen (15) days after service of the requests, by 5 p.m. on Thursday November 11, 2010 at the offices of Southeast Louisiana Legal Services, 1010 Common Street, Suite 1400A, New Orleans, Louisiana.

Please respond to each request and interrogatory in detail. If you cannot answer an interrogatory or request in full, answer to the extent possible and explain your inability to answer the remainder. You are specifically requested to supplement and amend all of you answers and responses on an on-going basis. Defendant will insist on strict compliance with the delays permitted by the Louisiana Code of Civil Procedure.

## As used in these Interrogatories, Requests for Production of Documents and Requests for Admissions:

I.      The term "*Note and Mortgage at issue*" refers to the note and mortgage attached to the Petition for Executory Process filed by Defendant in Orleans Parish Civil District Court Case No. 09-9485.

II.     The term "*Making Home Affordable program*" refers to the U.S. Department of Treasury's loan modification and refinance program. Information about this program is available at: http://makinghomeaffordable.gov.

III.    The term "*Property at issue*" refers to the property described in Plaintiff's Amended Petition to Annul Sheriff's Sale and for Damages, Paragraph II.

## REQUESTS FOR ADMISSIONS

Plaintiff propounds the following requests for admissions to Defendant to be answered separately, fully, in writing and under oath within the time allowed by the Louisiana Code of Civil Procedure:

**REQUEST FOR ADMISSION NO. 1:**

Admit that Bank of America is the servicer of loan.

**REQUEST FOR ADMISSION NO. 2:**

Admit that Bank of America has agreed to participate in the Making Home Affordable program.

**REQUEST FOR ADMISSION NO. 3:**

Admit that before the sheriff's sale of the Property at issue, held on April 22, 2010, Bank of America accepted a loan modification application from Defendant.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Bank of America did not deny or approve Defendant's loan modification before the sheriff's sale held on April 22, 2010.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Bank of America did not sent Defendant written correspondence indicating his loan modification application had been denied or approved before the sheriff's sale was held on April 22, 2010.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Plaintiff passed the Net Present Value Test ("NPV Test") under the Making Home Affordable program before April 22, 2010.

**REQUEST FOR ADMISSION NO. 7:**

After the sheriff's sale on April 22, 2010, Defendant accepted another loan modification application from Plaintiff.

**REQUEST FOR ADMISSION NO. 8:**

Defendant is currently the process of reviewing Plaintiff's account for a loan modification under the Making Home Affordable program.

**REQUEST FOR ADMISSION NO. 9:**

Defendant has not sent Plaintiff any correspondence indicating that Plaintiff's loan modification application submitted after April 22, 2010, has been denied or approved.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Plaintiff currently passes the Net Present Value Test ("NPV Test") under the Making Home Affordable program.

## INTERROGATORIES

Plaintiff propounds the following interrogatories to Defendant, to be answered separately, fully, in writing and under oath within the time allowed by the Louisiana Code of Civil Procedure:

**INTERROGATORY NO. 1:**

Please state the name of the current holder of the Note and Mortgage at issue.

**INTERROGATORY NO. 2:**

Please state the relationship between Defendant and the current holder of the Note and Mortgage at issue.

**INTERROGATORY NO. 3:**

Please state the relationship between Defendant and Bank of America.

**INTERROGATORY NO. 4:**

Please state the full name, address, telephone number, and email address of the negotiator, or other representative, at Bank of America who has been assigned to review the Note and Mortgage at issue for a Making Home Affordable loan modification.

**INTERROGATORY NO. 5:**

If you denied Request for Admission No. 1, please give all reasons and all evidence in support or tending to refute your answer.

**INTERROGATORY NO. 6:**

If you denied Request for Admission No. 2, please give all reasons and all evidence in support or tending to refute your answer.

**INTERROGATORY NO. 7:**

If you denied Request for Admission No. 6, please give all reasons and all evidence in support or tending to refute your answer.

**INTERROGATORY NO. 8:**

If you denied Request for Admission No. 10, please give all reasons and all evidence in support or tending to refute your answer.

**INTERROGATORY NO. 9:**

Please state names, job titles or positions, and employee numbers of each and every employee or agent of Plaintiff who has furnished the answers to the above interrogatories, specifying the interrogatories to which each furnished information.

**INTERROGATORY NO. 10:**

Please identify each and every document, writing, exhibit, or tangible thing which you will and/or may introduce as evidence or as an exhibit at the trial of this matter or at a hearing or trial of a motion for summary judgment.

**INTERROGATORY NO. 11:**

Please identify each and every witness that you may call or whose testimony you will and/or may attempt to offer by affidavit at the trial of this matter or at a hearing or trial of a motion for summary judgment.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff requests that Defendant produce the following documents or things for inspection or copying at the offices of Southeast Louisiana Legal Services, 1010 Common Street, Suite 1400A, New Orleans, Louisiana on or before 5:00 p.m., on November 11, 2010.

**REQUEST FOR PRODUCTION NO. 1:**

Please produce all documents relating to any Net Present Value Test ("NPV Test") that Bank of America, or other servicer of the Note and Mortgage at issue, has or will perform, including the Investor Code, Servicer Loan Number, GSE Loan Number, HAMP Servicer Number, Data Collection Date, Property – Number of Units, First Payment Date at Origination, Unpaid Principal Balance at Origination, Amortization Term at Origination, Interest Rate at Origination, LTV at Origination, Product Before Modification, Next ARM Reset Date, ARM Reset Date, Remaining Term, Unpaid Principal Balance Before Modification, Interest Rate Before Modification, Principal and Interest Payment Before Modification, Current Borrower

Credit Score, Current Co-Borrower Credit Score, Property Zip Code, Property State, Association Dues/Fees Before Modification, Monthly Hazard and Flood Insurance, Monthly Real Estate Taxes, MI Coverage Percent, Property Valuation – As-is Value, Mark-to-Market LTV, Months Past Due, Advances/Escrow, Borrower's Total Monthly Obligations, Monthly Gross Income, Imminent Default Flag, Discount Rate Risk Premium, Modification Fees, MI Partial Claim Amount, Unpaid Principal Balance After Modification, Interest Rate After Modification, Principal and Interest Payment After Modification, Principal Forbearance Amount, Principal Forgiveness Amount, Property Valuation Type, NPV Date, PRA Waterfall – Unpaid Principal Balance After Modification, PRA Waterfall – Interest Rate After Modification, PRA Waterfall – Amortization Term After Modification, PRA Waterfall – Principal and Interest Payment After Modification, PRA Waterfall – Principal Forbearance Amount, PRA Waterfall – Principal Forgiveness Amount, and Maximum Months Past Due in Past 12 Months.

**REQUEST FOR PRODUCTION NO. 2:**

Please produce all documents, correspondence and records sent by Bank of America, or other servicer of the Note and Mortgage at issue, its agents, attorneys and assigns, to Plaintiff between September 1, 2008 and present.

**REQUEST FOR PRODUCTION NO. 3:**

Please produce a copy of the Servicer Participation Agreement, or any contract, agreement, or correspondence between Defendant and any other entity, including Bank of America or other servicer, relating to the Note and Mortgage at issue.

**REQUEST FOR PRODUCTION NO. 4:**

Please produce each and every document, writing, or other tangible evidence which you will and/or may introduce at the trial of this matter or at a hearing or trial of a motion for summary judgment.

**REQUEST FOR PRODUCTION NO. 5:**

Please produce all reports, from experts and non-experts prepared by any person, firm, corporation, and/or entity relating to the note and mortgage at issue.

Respectfully submitted:
SOUTHEAST LOUISIANA LEGAL SERVICES

Lauren E. Bartlett (LSBA#31573)
1010 Common Street, Suite A-1400
New Orleans, Louisiana 70112

5

Telephone: (504) 529-1000
Fax: (504) 596-2241
Attorneys for Plaintiff Frederick Thomas

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing First Set of Interrogatories, Requests for Production of Documents and Request for Admissions has been served upon counsel of record by facsimile and by U.S. mail, postage prepaid and properly addressed, this 27th day of October, 2010.

_____
Lauren E. Bartlett

# SOUTHEAST LOUISIANA LEGAL SERVICES

1010 Common St., Suite 1400A
New Orleans, Louisiana 70112
Phone: (504) 529-1000  Fax: (504) 529-1009
Web Address: www.slls.org

**Lauren E. Bartlett**
**Staff Attorney**

**Direct Line:**     **(504) 529-1000 Ext. 271**
**Email:**           **lbartlett@slls.org**

VIA US MAIL

November 3, 2010

Laura Settlemyer
McGlinchey Stafford PLLC
PO Box 60643
New Orleans LA 70160-0643

Re:    **Loan No.          100045629**
       **Borrower:         Emanuel and Frederick Thomas (Estate of Clarence Thomas)**
       **Property address: 821-823 N. Dupre St.**
       **New Orleans, LA 70119**
       *Frederick Thomas v. BAC Home Loans Servicing, L.P.*, **CDC Case No. 2010-4340**

Hi Laura,

Enclosed please find the Memorandum in Opposition of Peremptory Exception of No Cause of
Action filed this afternoon.

Thanks,

Lauren E. Bartlett
Staff Attorney
Southeast Louisiana Legal Services
(formerly New Orleans Legal Assistance)
1010 Common St., Suite 1400A
New Orleans, LA 70112
Tel: (504) 529-1000 ext. 271
Fax: (504) 529-1009 or (504) 596-2241

  A Partner

ORLEANS PARISH CIVIL DISTRICT COURT
STATE OF LOUISIANA

No.  10-4340

Division: D
Section: 16

FRE͟ ͟IC͟  ͟HOMAS

͟VER ͟US

B͟  ͟HOM͟  ͟OAN͟ ͟ SERVICIN͟    ͟P.

FILED _____   _____          _____
                                                        ͟EPUTY CLERK


MEMORANDUM IN ͟PPOSITION ͟O DEFEN͟     ͟'S PEREMPTORY
EXCE͟ ͟ION OF NO CAUSE OF A͟  ͟ON

I.     INTRODUCTION

Plaintiff Frederick Tho͟   ͟ome was sold at a sheriff's sale on April 2͟ ͟, 2010, pursuant to a foreclosure action filed by BAC Home Lo͟ ͟ns Servicing, L.P. ("BAC").  One week later, Mr. Thomas filed a Petition to Annul Sheriff's Sale and for Damages ("Petition").  This memorandum is filed in response to the Peremptory Exception of No Cause of Action ("Exception") that BAC filed on August 26, 2010.

BAC argues in its Exception that Mr. Thomas' causes of action are barred by the Louisiana Credit Agreement Statute, La R.S. 6:1121, *et seq.*, which prohibits actions against a creditor based on an oral credit agreement.  However, that statute is not relevant to this case.  Mr. Thomas does not ask this court to order a loan modification or forbearance pursuant to an oral credit agreement.  Instead, Mr. Thomas asks this court to nullify the judgment and reverse the sale because BAC has not complied with federal law.

As a requirement of receiving a $25 billion bailout from U.S. taxpayers, BAC was required to review Mr. Thomas' application for a loan modification under the federal Making Home Affordable Program, and make a decision regarding his application, before selling his home.  Instead, BAC misled Mr. Thomas to believe that the sheriff's sale would be delayed, since his application for a loan modification was still under review.  Even two days before the sale, BAC told Mr. Thomas his application would still be considered.  BAC only told Mr. Thomas that his loan would not be considered for modification the day before the sale.  The judgment should be annulled because Mr. Thomas was lulled by BAC's conduct into not presenting his defenses to the foreclosure action.

1

Mr. Thomas had a meritorious defense in that BAC has never completed its review of his loan modification application.

## II.   FACTS

The allegations contained in the Petition and Amended Petition are incorporated herein.

Plaintiff Frederick Thomas is 54 years old and lives with his brother, Emanuel Thomas, at the property at issue, 821-823 N. Dupre Street, New Orleans, Louisiana, 70119.  Amended Petition ¶VII, VIII, XVII.  The brothers have owned the property since their father passed away in 2008. *Id.* at ¶XVI.

Defendant, BAC Home Loans, L.P. is a subsidiary of Bank of America, N.A.[1]  Bank of America is the nation's largest lender and made headlines the week before the foreclosure sale at issue for stating its intentions to provide loan modifications and principal reductions for distressed borrowers.[2]

Pursuant to the Emergency Economic Stabilization Act of 2008 ("EESA"), signed into law on October 3, 2008, the U.S. government formed a number of programs aimed at stabilizing the U.S. economy, including the Making Home Affordable Program ("HAMP") and the Troubled Asset Relief Program ("TARP").[3]  Under TARP, the U.S. government committed $700 billion to purchase assets and equity from financial institutions to strengthen the financial sector.  Bank of America received $25 billion from the U.S. Government in purchases of troubled assets in October 2008 through TARP.[4]  The U.S. Department of Treasury has ordered that all recipients of capital investments through TARP are required to participate in HAMP, sign a Servicer Participation Agreement, and follow the mortgage servicing guidelines promulgated by the U.S. Department of Treasury.[5]  Furthermore, special mortgage servicing guidelines exist when the loan is owned by Fannie Mae or Freddie Mac, as is the case here.[6]

HAMP was designed to address the national foreclosure crisis and is supposed to help homeowners avoid foreclosure.  HAMP directs the Department of Treasury to compensate

---

[1] *See* Bank of America's website, *available at:* https://homeloanbusiness.bankofamerica.com/.
[2] *See* Bank of America, with Merrill's Help, Returns to Profit, NY TIMES, 17 April 2010, *available at:* http://www.nytimes.com/2010/04/17/business/17bank.html.
[3] Full text of the Emergency Economic Stabilization Act of 2008, *available at:* http://www.govtrack.us/congress/billtext.xpd?bill=h110-1424.
[4] U.S. Department of Treasury Section 105(a) Troubled Assets Relief Program Report to Congress for the Period April 1, 2009 to April 30, 2009, p.16, *available at:* http://www.financialstability.gov/docs/105CongressionalReports/105aReport_042009.pdf.
[5] *See* the U.S. Department of Treasury's Financial Stability Plan website, *available at:* http://www.financialstability.gov/about/transparencyaccountability.html; and the Making Home Affordable Supplemental Directives and Handbook, *available at:* https://www.hmpadmin.com/portal/programs/ guidance.html.
[6] *See* Exhibit 1, attached, Fannie Mae HAMP FAQs. For a complete list of all Fannie Mae Servicing Guidelines, *see*

mortgage servicers for modifying loans where the borrower is or has undergone a hardship making it difficult for them to pay their mortgage. The hardship can include unemployment, death of a borrower, illness etc. A HAMP loan modification aims to bring the monthly mortgage payment down to 31% of the borrower's monthly household income for 5 years by reducing the interest rate down to 2% or lengthening the life of the loan.[7]

The Fannie Mae-HAMP Servicing Guidelines (the "Fannie Mae Guidelines") specifically require that "[t]o ensure that a borrower currently in foreclosure or at risk of foreclosure has the opportunity to apply for a HAMP modification, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program."[8] Moreover, "[f]oreclosure actions (with the exception of those in Georgia, Hawaii, Missouri and Virginia), including initiation of new foreclosure actions, must be postponed for all borrowers that meet the minimum HAMP eligibility criteria."[9]

The Fannie Mae Guidelines also require that if a servicer determines that a borrower is ineligible for HAMP, "the servicer must communicate that determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative."[10] Specifically, "[i]f a mortgage loan is deemed ineligible for HAMP [...] the servicer must explore other foreclosure prevention alternatives following Fannie Mae's workout hierarchy prior to initiating or resuming foreclosure."[11]

Despite the efforts of the U.S. government, foreclosure rates continue to rise across the country, with a record number of homes lost to foreclosure August 2010.[12] National experts point to the big servicers' (Bank of America, Wells Fargo, Chase etc.) refusal to comply with HAMP, despite taking TARP money, as one reason for the continued increase in foreclosure rates.[13]

---

Fannie Mae's website, *available at*: https://www.efanniemae.com/sf/mha/mhamod/.

[7] *See* HAMP Borrower FAQs, *available at*: http://www.makinghomeaffordable.gov/borrower-faqs.html.

[8] *See* Exhibit 1, HAMP FAQS, Q1106, attached and *available at*: https://www.efanniemae.com/sf/guides/ssg/relatedservicinginfo/pdf/hampfaqs.pdf, p.3.

[9] HAMP FAQS, Q1101, *available at*: https://www.efanniemae.com/sf/guides/ssg/relatedservicinginfo/pdf/hampfaqs.pdf, p.2.

[10] Fannie Mae HAMP Servicing Guide Announcement 0931, p.3, *available at*: https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2009/0931.pdf.

[11] *Id.* at 2.

[12] *See* Banks take over record number of homes in August, REUTERS, 16 September 2010, *available at*: http://www.reuters.com/article/idUSTRE68F0JY20100916.

[13] *See* Testimony of Irvin Trauss, Esq. before the TARP Congressional Oversight Panel, 24 Sept. 2009, *available at*: http://www.nytimes.com/2010/03/25/business/25housing.html?pagewanted=2&sq&st=nyt&scp=13; *See also* The Government's Incredible Shrinking Mortgage Mod Program, PROPUBLICA, 27 October 2010, *available at*: http://www.propublica.org/article/the-governments-incredible-shrinking-mortgage-mod-program.

## IV.   ARGUMENT

### A.  Mr. Thomas seeks to enforce federal law, not an oral credit agreement.

BAC argues in its Exception that Mr. Thomas' causes of action are barred by the Louisiana Credit Agreement Statute, La R.S. 6:1121, *et seq.*, which prohibits actions against a creditor based on an oral credit agreement.  However, Mr. Thomas does not seek to enforce an oral credit agreement here at all.  Mr. Thomas prays only that this court annul the judgment and reverse the sale at issue to allow BAC the time and space to comply with the federal HAMP servicing guidelines before proceeding with the sale of his property.

When Bank of America accepted $25 billion of U.S. taxpayers dollars as part of the great bailout of U.S. banks, it agreed to participate in HAMP.  BAC is required to review every Fannie Mae loan that it services for eligibility under HAMP before selling homes. *See* Exhibit 1, HAMP FAQS, Q1106, attached and *available at:* https://www.efanniemae.com/sf/guides/ ssg/relatedservicinginfo/pdf/hampfaqs.pdf, p.3.  Mr. Thomas had a Fannie Mae loan serviced by BAC. Amended Petition ¶XXVII.  Therefore, Mr. Thomas' loan should have been reviewed for a HAMP loan modification before his home was sold due to BAC's federal obligations to comply with HAMP.

BAC misses the mark when it argues that Mr. Thomas is seeking to enforce an oral credit agreement, which BAC defines in this case as statements made over the telephone to Mr. Thomas. Instead, Mr. Thomas is seeking to enforce federal law.

### B.  BAC fails to recognize that this case is in classic nullity posture; Mr. Thomas was deprived of his legal right to present a valid defense to foreclosure and enforcement of the judgment at issue would be unconscionable and inequitable.

Under LSA-C.C.P. art. 2001-4, a sheriff's sale may be attacked as a nullity if obtained by fraud or ill practices. *See Ellerd v. Williams,* 404 So.2d 1271, 1273 (La.App. 2nd Cir. 1981).  *See also Bankers Life Co. v. Shost,* 518 So.2d 563 (La.App. 5 Cir. 1987); *Jambois O. & M. Machine Shop, Inc. v. Dixie Mill Sup. Co.,* 218 So.2d 672 (La.App. 4th Cir. 1969); *White Motor Co. v. Piggy Bak Cartage Corp.,* 202 So.2d 294 (La.App. 4th Cir. 1967).  To nullify a judgment for fraud or ill practices two criteria must be met: "(1) the circumstances under which the judgment was rendered **show a deprivation of the legal rights of the litigant seeking relief**; and (2) enforcement of the judgment would be **unconscionable or inequitable**"(citations omitted) (emphasis added). *Johnson v. Cain,* 999 So.2d 51, 53 (La.App. 1 Cir. 2008).

4

The scope of LSA-C.C.P. art. 2004 is broader than cases of actual fraud or intentional wrongdoing and it "encompass[es] all situations wherein a judgment is rendered through some improper practice or procedure"(citations omitted). *Johnson v. Cain*, 999 So.2d 51, 52 (La.App. 1 Cir. 2008). Specifically, "**[w]hen ill practices are alleged, the court must examine the case from an equitable viewpoint** to determine whether the party seeking annulment has met the burden of showing 'how he was prevented or excused' from asserting his claims or defenses" (citations omitted) (emphasis added). *Id; see also Mississippi Farm Bureau Mut. Ins. Co. v. Bailey*, 818 So.2d 214, 216 (La.App. 1 Cir. 2002) ("foreseeable abuses" and "public interests" are determinative factors when considering whether a previous judgment should be annulled).

> i. **Mr. Thomas did not present his legal defense because of false assurances made by the adverse party.**

The bank's actions in advising Mr. Thomas on April 12 and April 20 that his application was still pending and that the foreclosure sale would probably be postponed again is a classic ground for a petition for nullity. Courts have repeatedly held that "[c]onduct which prevents an opposing party from having an opportunity to appear or to assert a defense constitutes a deprivation of his legal rights." *Kem Search, Inc. v. David A. Sheffield*, 434 So.2d 1067 (La. 1983); *Chauvin v. Nelkin Ins. Agency, Inc.* 345 So.2d 132 (La.App. 1st Cir. 1977), writ denied, 347 So.2d 256 (La. 1977); *Schoen v. Burns*, 321 So.2d 908 (La.App. 1st Cir. 1975); *Estelle J. Wilson Mortuary, Inc. v. Waker*, 244 So.2d 630 (La..App. 4 Cir. 1971) (nullified judgment where attorney for the mortuary made assurances that he would not prosecute defendant and did anyway); *St. Mary v. St. Mary*, 175 So.2d 893 (La.App. 3d Cir. 1965); *Lazarus v. McGuirk*, 42 La.Ann. 194, 8 So. 253 (La. 1890) ("whenever, by reason of plaintiff's fraudulent conduct or representations to defendant concerning the nature and objects of the action or the purpose of the judgment, or the prosecution of the cause, defendant in the action, having a good defense upon the merits, is lulled into security, so that he fails to interpose his defense, he is entitled to the aid of equity to prevent the plaintiff from reaping the benefit of a judgment thus fraudulently obtained"). *See also Phillips v. Patin*, 517 So.2d 190 (La.App. 1 Cir. 1987); *Steele v. Ruiz*, 202 So.2d 376 (La.App. 4 Cir. 1967) (holding defendant could not maintain an action for nullity of the default judgment based on alleged defenses of fraud or ill practices which could and should have been pleaded in original suit).

If not lulled into believing his HAMP request was still pending, Mr. Thomas could have enjoined the sale. Non-compliance with HAMP is a valid affirmative defense to foreclosure. The

Making Home Affordable Program servicing guidelines promulgated by the U.S. Department of Treasury are very similar to the servicing guidelines promulgated by the U.S. Department of Housing and Urban Development's Federal Housing Administration.[14] Courts across the country have held that a mortgage company's failure to comply the U.S. Department of Housing and Urban Development's Federal Housing Administration (FHA)-Insured Home Loan Servicing Guidelines is a complete defense to a mortgage foreclosure action. *See Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 922 A.2d 538 (Md., 2007); *Washington Mutual Bank v. Mahaffey*, 154 Ohio App.3d 44,49 (Ohio Ct. App. 2003); *Mellon Mortgage Co. v. Larios*, 1998 WL 292387 (N.D.Ill. May 20, 1998), *citing Bankers Life Co. v. Denton*, 120 Ill.App.3d 576, 579 (1983); *Hinton v. Federal Nat. Mortg. Ass'n*, 945 F.Supp. 1052 (S.D. Tex., 1996); *Fleet Real Estate Funding Corp. v. Smith*, 366 Pa.Super 116, 124 (Pa. Super. 1987); *Federal Nat. Mortg. Ass'n v. Moore*, 609 F.Supp 194, 198 (N.D.Ill. 1985); *Cross v. Federal Nat. Mortg. Ass'n*, 359 So.2d 464, 465 (Fla. App. 1978); *Federal Nat. Mortg. Ass'n v. Ricks*, 372 N.Y.S.2d 485, 496-97 (N.Y. Sup. Ct. 1975). *See also Roberts v. Cameron-Brown Co.*, 556 F.2d 356 (5th Cir. 1977) (holding the borrower was an incidental beneficiary who had no cause of action, but with no discussion of failure to comply with FHA-Insured Home Loan Servicing Guidelines as a defense).

Given the unique posture of executory proceedings in Louisiana, defendants do not have a chance to file an answer. Defendants in executory proceedings must appeal the judgment or file for an injunction to stop the sale. LA CCP Art. 2752. Once Mr. Thomas found out the sale was going forward the day before the sale, he could not obtain relief since a Temporary Restraining Order to stop a foreclosure sale is not allowed; a hearing must be held for a Preliminary Injunction to be granted. LA CCP Art. 2752. Here, Mr. Thomas was misled by BAC into believing that the sale would be stopped until the day before the sale, thus leaving him no time to obtain a preliminary injunction before the sale. Mr. Thomas should be allowed to proceed where it was specifically BAC's fraud and ill practices that disallowed him from otherwise asserting defenses to foreclosure in a court of law. *See Kem Search, Inc.* and the other nullity cases cited above.

As a result, the bank's emphasis on a state statute about its fiduciary duties is misplaced. Mr. Thomas seeks nullity based on the litigation conduct of the adverse party, which persuaded him not present a valid defense to the foreclosure sale of his home.

---

14 For example, a requirement of FHA-insured mortgage servicing guidelines is a written statement from the mortgagee to the mortgagor when/if the mortgage does not qualify for FHA loss mitigation programs. The FHA also requires an in-person meeting between the mortgagor and mortgagee after the mortgagor applies for loss mitigation assistance. Guidelines for servicing FHA-insured loans are available in multiple formats on the U.S. Department of Housing and Urban Development website, *available at*: http://www.hud.gov/offices/hsg/sfh/nsc/lmmltrs.cfm.

ii. **It would be unconscionable and inequitable to enforce this judgment where there is a strong public interest to have banks that accepted bailout money comply with HAMP.**

There is a strong public in     t to     loans reviewed fo     \IP prior to sale. The White House and U.S. Department of Trea  y, as     l as Congress, 1     determined that the stabilization of the U.S. economy depends on the     of t.  national forec  sure crisis. *See* Preamble to the Economic Stabilization Act of 2008 ("EI SA") ("To provide authority for the Federal Government to purchase and insure certain types of troubled assets for the purposes of providing stability to and preventing disruption in the economy and financial system"); and www.financialstability.gov ("Making Home Affordable: The Administration's goal is to promote stability for both the housing market and homeowners.")

Facing the prospect of a repeat of the Great Depression, Congress decided it was of utmost importance to end the foreclosure crisis and decided that HAMP loan modifications were a good way to do that. Congress enacted EESA, gave $25 billion to Bank of America, and required Bank of America to participate in the Making Home Affordable Program to stabilize the U.S. economy. By taking $25 billion from the U.S. government, yet ignoring its requirements to participate in the Making Home Affordable Program, Bank of America is only adding to the increasing numbers of foreclosures across the nation. Moreover, given the number of foreclosures filed by executory process in Louisiana, it is very foreseeable that in the near future other homeowners will face the same problems with Bank of America and other lenders; homes will be sold regardless of whether or not banks complied with federal law and HAMP.

C. **The Louisiana Credit Agreement Statute, La R.S. 6:1121, *et seq.*, is not relevant to any of Mr. Thomas' other causes of action either.**

For example,

i. **Wrongful Foreclosure**

In a recent decision, the Second Circuit of Louisiana outlined elements of the wrongful foreclosure doctrine in *Bank of New York v. Parnell*, 32 So.3d 877 (La.App. 5 Cir. 2010). Under Louisiana law, to have a cause of action for wrongful foreclosure, "a plaintiff must first show the seizure was illegal or wrongful." (citations omitted) *Id.* at 895. Next, under the duty/risk analysis, a plaintiff must show that "the wrongful seizure was caused by the fault of one who owed a duty to the plaintiff, and that there was a breach of this duty." *Id.*

Here, BAC's seizure of Mr. Thomas' home was both illegal and wrongful because BAC did not comply with HAMP. Furthermore, BAC violated its duties to Mr. Thomas under the Abuse of Rights doctrine; BAC negligently inflicted emotional distress on Mr. Thomas and his brother; and BAC failed to mitigate damages, as discussed below. These duties are all based on the original note and mortgage at issue and the mortgage servicer-mortgagor relationship, not any oral credit agreement. BAC's wrongful conduct and breach of its duties to Mr. Thomas were the direct cause of the wrongful foreclosure.

### ii.     Abuse of Rights doctrine

The Abuse of Rights doctrine is a civilian concept of judicial control which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights. *Truschinger v. Pak*, 513 So.2d 1151, 1154 (La. 1987)(citing *Illinois Central Gulf Railroad Co. v.International Harvester Co.*, 368 So.2d 1009 (La. 1979)); *Morse v. J. Ray McDermott & Co.*, 344 So.2d 1353 (La. 1977); *Onorato v. Maestri*, 173 La. 375, 137 So.67 (1931); *Higins Oil & Fuel Co. v. Guaranty Oil Co.*, 145 La. 233, 82 So.206 (1919). The Abuse of Rights doctrine has been applied only when one of the following conditions is met: (1) if the predominant motive for it was to cause harm; (2) if there was no serious or legitimate motive for refusing; (3) if the exercise of the right to refuse is against moral rules, good faith, or elementary fairness; or (4) if the right to refuse is exercised for a purpose other than for which it was granted. *Id.*

Here, BAC had no legitimate motive to not comply with HAMP, in defiance of its obligation to the federal government, after taking $25 billion from U.S. taxpayers. Moreover, BAC's conduct demonstrates an abuse of rights because BAC's exercise of the right to refuse to review Mr. Thomas' HAMP application before proceeding with the sale of his property is against moral rules, good faith, and elementary fairness. This judgment should be annulled since BAC's right to proceed with foreclosure and the sale of the property at issue was surely unenforceable in light of the fact that BAC's refusal to comply with HAMP clearly falls within the Abuse of Rights doctrine.

### iii.     BAC violated its duty to mitigate damages when it sold Mr. Thomas' home at the sheriff's sale without making a decision on his HAMP application.

Louisiana law requires that any damages be mitigated by the collecting party: "An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be

accordingly reduced." La. C.C. art. 2002.  Moreover, the duty to mitigate damages exists in both tort

and contract law. *Merlin v. Fuselier Const., Inc.*, 789 So.2d 710, 716 (La.App. 5 Cir. 2001).

BAC here had an obligation to review Mr. Thomas' HAMP application.  By failing to do so,

BAC failed to mitigate its damages.  BAC could have earned money from the U.S. Department of

Treasury for modifying Mr. Thomas' loan, yet instead they spent over $58,000 to buy the property at

the foreclosure sale.  A reasonably prudent person would have at least completed the review of a

loan modification application to try to minimize damages, before proceeding with the foreclosure

sale.  The Sheriff's sale that occurred on April 22, 2010 should be nullified and reversed, giving BAC

the chance to mitigate its damages.

## V. CONCLUSION

WHEREFORE, Plaintiff Frederick Thomas respectfully urges this honorable Court to

nullify the Sheriff's sale that occurred on April 22, 2010 of the property described above.

Plaintiff further requests judgment in his favor and against Defendant, ordering that the Civil

Sheriff of Orleans Parish restore the quiet possession of the above-described property to Plaintiff

and for costs herein and such other and further relief as the Court may deem equitable and just.

Respectfully submitted,
SOUTHEAST LOUISIANA LEGAL SERVICES

By: _____

LAUREN E. BARTLETT, LSBA Bar No. 31573
DAVID H. WILLIAMS, LSBA Bar No. 17867
1010 Common Street, Suite 1400A
New Orleans, Louisiana  70112
Telephone: (504) 529-1000, ext. 271
Fax: (504) 529-1009

Attorneys for Frederick Thomas

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on counsel of record for all
parties by email and depositing same in the United States Mails, first class mail, properly addressed
and postage prepaid this 3rd day of November, 2010.

_____
LAUREN E. BARTLETT

 

MAKING HOME AFFORDABLE℠

# Frequently Asked Questions – *Servicing Guide* Announcement 09-05R: *Home Affordable Modification*

As of February, 25 2010

This document clarifies *Servicing Guide* Announcement 09-05R and *Servicing Guide* Announcement 09-31. Servicers remain responsible for following the Fannie Mae Single-Family *Selling and Servicing Guides*, Announcements, and Delegations of Authority (collectively, the "Guides"), and in the event of a conflict between the information in these FAQs and the Guides, the terms of the Guides shall govern.

## A.    General

**Q1000. Who should I contact with HAMP-related questions?**

Policy clarifications or loan-level questions by servicers should be directed to the following:

| For questions regarding: | Contact: |
| --- | --- |
| • **Non-GSE** Supplemental Directives, policy clarifications, and loan-level questions<br>• All reporting for the U.S. Treasury Department using HAMP Data Collector or the HAMP Reporting System | **HAMP Support Center:**<br>• support@hmpadmin.com<br>• 1-866-939-4469<br>• 9:00 a.m. to 9:00 p.m. ET, Monday through Friday |
| • **Fannie Mae** HAMP-related *Servicing Guide* Announcements, policy clarifications, or loan-level questions<br>• Fannie Mae reporting via HomeSaver Solutions® Network (HSSN) | **Fannie Mae Servicer Support Center:**<br>• servicing_solutions@fanniemae.com<br>• 1-888-FANNIE-5  (326-6435)<br>• 9:00 a.m. to 8:00 p.m. ET, Monday through Friday |
| • **Freddie Mac** HAMP-related Guide Bulletins, policy clarifications, and loan-level questions<br>• Freddie Mac reporting | **Freddie Mac Servicer Support:**<br>• 1-800-FREDDIE  (373-3343)<br>• 8:00 a.m. to 8:00 p.m. ET, Monday through Friday business days |



EXHIBIT
1

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.
Revised - FM 02/25/10
1

## B.   Borrower Eligibility

**Q1100. Does the reason for the default have to be resolved before a borrower is eligible for a Home Affordable Modification?**

Servicers should encourage borrowers to resolve the cause of a mortgage default, when appropriate, including providing referrals to HUD-approved housing counselors. However, a servicer cannot require a borrower to resolve the reason for the default as a condition of a Home Affordable Modification if the borrower meets HAMP eligibility requirements.

**Q1101. How should borrowers who contact their servicer be handled with respect to HAMP if the servicer does not yet have the proper documents or is not yet equipped to evaluate the borrower's situation?**

Servicers are required to validate the homeowner's eligibility for HAMP and capacity to pay. Servicers should begin the process of collecting the required documentation from the homeowner and the information necessary to establish an escrow account on non-escrowed loans. Based on the servicer's understanding of the homeowner's ability to pay, a servicer may place a homeowner on a forbearance plan pending its ability to execute a HAMP modification. Foreclosure actions (with the exception of those in Georgia, Hawaii, Missouri and Virginia), including initiation of new foreclosure actions, must be postponed for all borrowers that meet the minimum HAMP eligibility criteria.

**Q1102. Can a loan be modified to a monthly mortgage payment ratio below 31 percent?**

Servicers must apply the specified modification steps until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going under 31 percent. Servicers must request prior written approval from Fannie Mae to deviate from the specified modification steps or to reduce the monthly mortgage payment ratio below 31 percent. In any event, incentive payments will be made based only on modification terms that reflect a 31 percent monthly mortgage payment ratio.

**Q1103. Are home equity loans that are in first lien position eligible for modification under HAMP?**

First lien home equity loans or lines of credit are eligible for modification under HAMP provided that the borrower and loan meet the basic HAMP eligibility criteria and (i) the servicer has the capability within its servicing system to clearly identify the loan as a first lien and (ii) the servicer has the ability to establish an escrow for the loan as required by *Servicing Guide* Announcement 09-05R.

Any HAMP modification of a first lien home equity line of credit must result in a modified loan that is a fixed rate, fully amortizing loan that does not permit the borrower to draw any further amounts from the line of credit.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q1104.** **REVISED**   **Can a servicer issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have current association fee information?**

Yes. A servicer may issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have the current association fee information. If a borrower has indicated that there are association fees, but has not been able to provide current written documentation to verify the fees, the servicer may rely on the information provided by the borrower if the servicer has made reasonable efforts to obtain the association fee information.

**Q1105. If a borrower is delinquent and currently has a front end monthly mortgage payment ratio less than 31 percent, but capitalization of the delinquent amounts will cause the monthly mortgage payment ratio to exceed 31 percent, does the borrower qualify for HAMP?**

No. The borrower will only qualify for HAMP if the verified income documentation confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent and provided that the borrower is eligible for at least a 1/8th percent drop in the interest rate without the modified monthly mortgage payment ratio going below 31 percent.

**Q1106. Must servicers suspend foreclosure or not initiate foreclosure for all borrowers who are potentially eligible for HAMP?**

To ensure that a borrower currently in foreclosure or at risk of foreclosure has the opportunity to apply for a HAMP modification, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program. Additionally, servicers are strongly encouraged not to initiate foreclosure until a borrower has been evaluated and determined to be ineligible for the program or the borrower fails to respond to a trial period plan offer that has been made by the servicer.

**Q1107. Intentionally Left Blank**

**Q1108. Is a loan that secures a property owned by an *inter vivos* (living) revocable trust eligible for HAMP? What additional information or documentation, if any, should be obtained?**

A loan secured by a property owned by an *inter vivos* revocable trust is eligible for HAMP as long as the borrower (i) is a trustee of the trust, (ii) is a primary beneficiary of the trust, and (iii) occupies the property as his or her primary residence. The borrower must sign all HAMP-related documents in both an individual capacity and as trustee of the *inter vivos* revocable trust. For document requirements, servicers should refer to the "Other Pertinent Information" section of the document summary for the Home Affordable Modification Agreement (Fannie Mae/Freddie Mac Uniform Instrument, Form 3157) (the "Home Affordable Modification Agreement"),which is available at

https://www.efanniemae.com/sf/formsdocs/documents/specialpurpose/doc/3157.doc .

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q1109. Are audited profit and loss (P&L) statements required when verifying income for HAMP?**

Audited P&L statements are NOT required for HAMP.

**Q1110. If a borrower makes the existing contractual monthly payment rather than the trial period payment during the trial period, should the servicer accept the higher payment from the borrower, depositing the difference in a suspense account?**

A borrower must make the trial period payments when due as indicated in the trial period plan during the trial payment period. Should a borrower make their contractual monthly payment rather than their trial period payment, the servicer must apply the contractual monthly payment in accordance with the borrower's current loan documents. If the application of the contractual payment results in the borrower being in a current status, the servicer must advise the borrower that a new trial period plan must be prepared and the borrower must restart the trial period.

**Q1111. Can a borrower qualify for HAMP if the mortgage loan is currently in the redemption period after a foreclosure sale?**

The answer to this question is dependent on the amount of time remaining in the redemption period and legal requirements of the state in which the property is located. When permissible under state law, the servicer should, on a case-by-case basis, seek Fannie Mae approval prior to evaluating a borrower for HAMP during a redemption period.

**Q1112. If borrowers who are unrelated by marriage, civil union or similar domestic partnership under applicable law purchased their home together and one borrower has vacated the property, is the occupying co-borrower eligible to apply for HAMP?**

Yes, the occupying co-borrower may pursue HAMP if a quitclaim deed evidencing that the non-occupying co-borrower has relinquished all rights to the property has been recorded. In cases where borrowers who are unrelated by marriage, civil union or similar domestic partnership and either borrower or co-borrower relinquish all rights to the property securing the mortgage loan through a recorded quitclaim deed, the non-occupying borrower that has relinquished property rights is not required to provide income documentation or to sign the HAMP documents but remains liable for the outstanding mortgage debt.

**Q1113.** *Servicing Guide* Announcement 09-31 requires a servicer to use a recent credit report to verify that the property securing the mortgage loan is the borrower's primary residence. Is it acceptable to confirm the borrower's primary residence with other forms of documentation besides the credit report?

In all cases, a servicer must obtain a credit report to verify that the property securing the mortgage is the borrower's primary residence. If the credit report does not support the borrower's certification that the property securing the mortgage loan is the borrower's principal residence, the servicer must use other documentation, such as a federal income tax return or utility bill, to reconcile the inconsistency. This additional due diligence on the part of the servicer must be documented in the loan file/servicing system for compliance review purposes.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

## C.    De Minimis Test

**Q1200. For loans that are not fully amortizing products, what payment amount is used for the de minimis test?**

In all cases, the monthly mortgage payment that was used to determine the borrower's eligibility (adjusted as applicable to include property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees) should be compared to the borrower's monthly mortgage payment under HAMP (with the same adjustments). Therefore, the monthly mortgage payment used to determine eligibility for loans that are not fully amortizing would not include full amortization of principal.

## D.    Documents

**Q1300. Are there separate Servicer Participation Agreements (SPA) for Fannie Mae, Freddie Mac, and non-GSE loans?**

The SPA and related documentation must be executed by servicers for non-GSE loans in order to receive Treasury-funded incentives and compensation. Servicers are not required to execute an SPA for GSE loans, since both Fannie Mae and Freddie Mac have made the program mandatory as detailed in their respective Announcements and Bulletins.

**Q1301. Intentionally Left Blank**

**Q1302. Intentionally Left Blank**

**Q1303. Are there separate modification documents for GSE and non-GSE loans?**

A single set of model modification documents has been provided for all loans regardless of investor. However, the documents may need to be customized for certain situations that are unique to Fannie Mae. Please refer to *Servicing Guide* Announcement 09-05R and the document summary for specific revisions required to be made to the documents for Fannie Mae loans.

**Q1304.** REVISED **Are state-specific documents required on non-recording HAMP modifications? For example, are state-specific balloon riders required when applicable?**

The servicer must revise the HAMP documents as necessary to comply with federal, state, and local laws. For example, in the event that the HAMP modification results in principal forbearance, servicers are obligated to modify the uniform instrument to comply with laws and regulations governing balloon disclosures.

For all Fannie Mae mortgage loans that are modified pursuant to HAMP, the servicer must follow Fannie Mae guidance with respect to ensuring that the modified mortgage loan retains its first-lien position and is fully enforceable. *Servicing Guide* Announcement 09-05R, *Servicing Guide* Announcement 09-31 and *Servicing Guide* Announcement 09-36 detail the circumstances under which the Home Affordable Modification Agreement must be recorded for Fannie Mae loans.

© 2010 Fannie Mae. Trademarks of Fannie Mae.

The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

Revised - FM 02/25/10

5

**Q1305. If the borrower files for bankruptcy protection during the trial period, is the trial period plan canceled automatically or is a servicer required to continue to work with the borrower?**

Borrowers who file bankruptcy during the trial period remain eligible for a HAMP modification provided they make all of the required payments in a timely fashion, are otherwise in compliance with the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct. The servicer and its bankruptcy counsel must work with the borrower and the borrower's bankruptcy counsel to obtain any required court approvals of the modification. A borrower actively involved in a bankruptcy proceeding prior to being placed in HAMP is eligible for HAMP at the servicer's discretion. If a servicer provides an offer under HAMP to a borrower that is involved in an active bankruptcy case, the servicer must work with the borrower or borrower's counsel to obtain all necessary approvals from the bankruptcy court.

**Q1306. How should servicers address loan documents that did not include standard escrow provisions?**

Servicers must replace Section 4.D. of the Home Affordable Modification Agreement with industry standard escrow account provisions that are comparable to the escrow account provisions found in the Fannie Mae/Freddie Mac uniform instruments.

In addition, if the servicer uses a Home Affordable Modification Trial Period Plan (Fannie Mae/Freddie Mac Uniform Instrument, Form 3156) (the "Trial Period Plan"), the servicer must insert the following language at the end of section 4.C. of the Trial Period Plan: "Unless the Lender determines that an Escrow Account may not be established in connection with the mortgage loan under applicable law, this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fund my Escrow Account. If the Loan Documents do not currently have Escrow Account provisions comparable to those in the Fannie Mae/Freddie Mac Uniform Security Instruments, such Escrow Account provisions comparable to the Escrow Account provisions in the Fannie Mae/Freddie Mac Uniform Instrument for the state in which the property is located, shall be added in the Modification Agreement."

**Q1307. Are servicers permitted to insert conditional language in the Home Affordable Modification Trial Period Plan and the Home Affordable Modification Agreement to avoid having to review each set of base loan documents to determine if they contain prepayment or assumption provisions or, in order to retain first lien position, require subordination agreements and/or title policy endorsements?**

The Home Affordable Modification Trial Period Plan (Form #3156) and the Home Affordable Modification Agreement (Form #3157), currently available at https://www.efanniemae.com/sf/formsdocs/documents/specialpurpose/, have been updated to include the necessary conditional language.

**Q1308. Must all prepayment penalties be waived in connection with a HAMP modification, or only prepayment penalties associated with borrower "pay for performance" principal balance reduction payments?**

No prepayment penalties may be assessed in connection with modifications under HAMP. Therefore, if any provision in the note or in any addendum or amendment to the note allows for the assessment of a penalty for full or partial prepayment of the note, such provision must be waived. Conditional language to implement this waiver is included in the Home Affordable Modification Agreement.

© 2010 Fannie Mae. Trademarks of Fannie Mae.                                                                    Revised - FM 02/25/10

The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.                    6

**Q1309. Intentionally Left Blank**

**Q1310. If the standard modification waterfall requires principal forbearance, should the Home Affordable Modification Agreement be amended to reflect the principal forbearance amount?**

The Home Affordable Modification Agreement must be revised to reflect the principal forbearance amount. The exact modification language can be obtained from the document summary for the Home Affordable Modification Agreement at:

https://www.efanniemae.com/sf/formsdocs/documents/specialpurpose/doc/3157.doc

**Q1311. If the borrower had no obligation under the Loan Documents to remit escrow items or the lender waived the requirement to pay escrow items prior to entering into the trial period plan (the terms of which revoked that waiver), must the borrower continue to remit escrow items with the monthly payment if the borrower fails the trial period?**

Once the escrow account is established, the borrower must continue to make monthly escrow payments.

## E.    Escrow

**Q1400. Can escrow payment estimates be used to determine payments during the trial period to avoid delays in processing?**

Servicers may perform an escrow analysis based on estimates prior to extending a trial period plan. However, if a servicer estimates the escrow payments for the trial period plan, the servicer is not permitted to use national averages in the estimate calculations. Prior to determining the borrower's eligibility for HAMP based on documentation, servicers must complete an escrow analysis to determine the exact escrow payments before signing the Trial Period Plan.

**Q1401. How should servicers treat escrow shortages?**

In the event the initial escrow analysis identifies an escrow shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage. Any actions taken by the servicer to eliminate the escrow shortage must be in compliance with applicable laws, rules, and regulations, including, but not limited to, the Real Estate Settlement Procedures Act.

**Q1402. If a borrower has successfully completed the trial period plan and the servicer is preparing the Home Affordable Modification Agreement, should the servicer have the borrower execute a note for any escrow advance?  Should the servicer provide a Truth-in-Lending (TIL) statement for this loan?**

The servicer should not have the borrower execute a note for any escrow advance. Instead, the servicer should capitalize any escrow advance that has been or will be paid to a third party before the modification agreement's effective date as outlined in *Servicing Guide* Announcement 09-05R. If capitalization is prohibited by applicable law, the servicer must collect such funds from the borrower over a 60-month repayment period unless the borrower decides to pay the amount upfront. A Truth-in-Lending (TIL) statement is not applicable in this matter.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

## F.   Principal Forbearance

**Q1500. If a Borrower with principal forbearance makes a substantial principal curtailment that is greater than or equal to the interest-bearing unpaid principal balance (UPB), should the curtailment be applied to the interest bearing principal or the principal forbearance portion?**

The curtailment should be applied to the principal forbearance portion. This policy eliminates the possibility of a curtailment paying off (and satisfying) the interest-bearing portion of the UPB (the entire loan would become due and payable at that point), thereby forcing the borrower to pay off the principal forbearance portion of the loan balance. In those instances, to avoid that negative result, the curtailment must be applied to the principal forbearance amount. Any remaining funds would be applied to the interest-bearing UPB.

**Q1501. Intentionally Left Blank**

## G.   HUD Counseling

**Q1600. Who pays for the HUD counseling?**

There is no charge to either borrowers or servicers for HUD-approved counseling (borrowers whose back-end debt-to-income ratio is equal to or greater than 55% must represent in writing in the HAMP documents that they will obtain such counseling). Servicers may, at their discretion, use a portion of the servicer incentive compensation to compensate counselors for counseling services provided in conjunction with HAMP.

**Q1601. If a borrower has recently completed HUD-approved debt counseling, do they still need to work with a counselor?**

Borrowers with back-end debt-to-income ratios of 55 percent or more must agree in writing to obtain HUD-approved counseling as a condition of receiving a HAMP modification, even if they recently completed counseling.

## H.   Income Verification

**Q1700. Why must the borrower submit an IRS Form 4506-T?**

Servicers should refer to the guidance provided in _Servicing Guide_ Announcement 09-31 with respect to IRS Form 4506-T. Servicers should also note that on October 21, 2009, the IRS introduced Form 4506T-EZ. Form 4506T-EZ is a permissible substitute under HAMP for Form 4506-T for borrowers who filed a Form 1040 series on a calendar-year basis.

**Q1701. If a borrower submits unsigned tax returns, but provides evidence the returns were electronically filed, does evidence of the electronic filing satisfy the requirement for "signed tax returns"? If a borrower submits unsigned tax returns, must a servicer file the Form 4506-T or may they return the tax returns to the homeowner for signature?**

Evidence of an electronically filed tax return satisfies the signed tax return requirement. If the borrower submits an unsigned tax return without evidence of electronic filing, the servicer may either file the Form 4506-T or return the tax return to the homeowner for signature. Upon execution, the borrower should return the "signed" return to the servicer.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q1702. Is the borrower eligible for HAMP if he or she is not a current tax filer?**

Yes. Only the borrower's most recent tax return needs to be obtained. If the tax return for the most recent tax year is not available, the servicer must process the borrower's signed Form 4506-T to confirm that the borrower did not file a tax return for that year.

**Q1703. Is the borrower eligible for HAMP if he or she is not required to file a tax return?**

Yes. Such a borrower must document why he or she does not need to file a tax return. The servicer must review and approve this rationale. A borrower is not eligible for HAMP if the borrower was required to file a tax return but failed to do so.

**Q1704. If the borrower can provide two pay stubs that show current earnings used for qualifying purposes under HAMP, can the servicer use only that information and not require YTD earnings?**

No. Documentation of YTD earnings is a requirement of HAMP. Current earnings should be used to qualify the borrower. YTD earnings can be used to substantiate additional income such as bonuses and overtime.

**Q1705. Could you please clarify the intent behind "third party documents" related to self-employed income?**

As provided in *Servicing Guide* Announcement 09-31, third party documents are no longer required for self-employed borrowers.

**Q1706. Can income of a household member not on the original note be used in the income calculations to qualify for the modification? If so, would it require that the person be added to the Note for the modification?**

A borrower has the option of disclosing a household member's income (where the household member is not included on the Note). Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if there is documentary evidence that the income has been, and reasonably can continue to be, relied upon to support the mortgage payment. All non-borrower household income included in monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income. The borrower may elect to add a new borrower to the note, but it is not a requirement in order to include the household member's income in the Home Affordable Modification evaluation.

**Q1707. If income from other non-borrower household members is considered under HAMP, should a servicer also consider expenses for the other household members?**

A servicer should not consider expenses of non-borrower household members but may consider the percentage of his or her income that the non-borrower routinely contributes to the household.

**Q1708. What action should the servicer take if the tax returns do not align with the paystubs provided?**

The servicer should ask the homeowner to explain material differences between tax returns and income documentation, and document such differences in the servicing system. If the verified

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

documentation reasonably indicates that a borrower is committing fraud, the servicer should not extend the modification.

**Q1709. For a loan in foreclosure, may a servicer require the homeowner to make the initial payment in certified funds?  May a servicer require certified funds on subsequent payments?**

Servicers should continue to follow their current practices, subject to applicable law and the mortgage documents, as it relates to requiring borrowers to make payments using certified funds. Servicers may not impose any stricter standard for payments due under HAMP than are applied in the Servicer's other loss mitigation programs.

## I.    Net Present Value (NPV) Model

**Q1800. What is the NPV model and what is it used for?**

The NPV model determines the NPV outcome (positive or negative) for a given modification. A positive NPV occurs where the discounted value of expected cash flows for the modified loan is higher than the discounted value of expected cash flows for the unmodified loan. The NPV model resides on the servicer Web portal (www.HMPadmin.com), and is available to all participating servicers of both GSE and non-GSE mortgage loans eligible for a Home Affordable Modification.

**Q1801. Is there a different NPV model for non-GSE and GSE loans?**

The same basic NPV model will be used by each servicer for both non-GSE and GSE loans. However, as discussed below, large servicers will be able to customize the model based on the unique performance of their own portfolios. Additionally, with respect to certain assumptions such as discount rate, servicers may use different values for non-GSE and GSE loans, subject to the respective GSE's guidelines.

**Q1802. Will every servicer be required to use the same discount rate in calculating NPV?**

For Fannie Mae loans, servicers should use a discount rate equal to the Freddie Mac Primary Mortgage Market Survey (PMMS) rate for 30-year fixed-rate conforming loans, with no premium added. Servicers should follow Freddie Mac guidance with respect to the discount rate used for Freddie Mac loans.

For non-GSE loans, servicers have the option of using the same discount rate for all loans or choosing one discount rate for loans they service for themselves and a different discount rate for loans serviced for all third party investors. The discount rate applied to loans serviced on behalf of third party investors must be at least as high as the discount rate applied to a servicer's held portfolio, but in no event higher than the maximum rate permitted under HAMP. Program guidelines establish a base discount rate for non-GSE loans equal to the Freddie Mac Primary Mortgage Market Survey (PMMS) rate for 30-year fixed-rate conforming loans. Servicers of non-GSE loans may add a premium of up to 250 basis points to this rate.

**Q1803. Can the HAMP modification be pursued if the NPV result is negative?**

For Fannie Mae loans with an initial NPV evaluation on or after December 1, 2009, if the mortgage loan is deemed "NPV negative" (per the NPV model output) where the value for the "no modification" scenario exceeds the value for the "modification" scenario by more than $5,000, the servicer may not perform the modification without the express written consent of Fannie Mae.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

For example, if the no modification scenario produces a value of $10,000 and the modification scenario produces a value of $4,000, the servicer needs the express written consent of Fannie Mae to perform the modification.

## Q1804. Will servicers be able to build the NPV model into their platform/system? Can they customize the NPV Calculator?

Yes. Detailed business and technology requirements for servicers wishing to install the NPV Calculator on their own systems are forthcoming and will be posted on http://www.HMPadmin.com. The most recent Net Present Value Model Documentation can be obtained at http://www.HMPadmin.com.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV model that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios. The default model must take into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status, and other loan or borrower attributes. Customized versions of the NPV model must utilize the base NPV model values for variables such as home price projections and foreclosure and REO timelines and costs. These values are posted on www.HMPadmin.com, and will be periodically updated. Any servicer electing to either build the NPV model into their platform/system and/or create a customized version of the NPV model must first successfully pass an output test, as to ensure that the servicer NPV model outputs are consistent with the base Treasury model. Servicers may not begin using a recoded or customized model without first obtaining an acceptable output test.

Servicers must consult Fannie Mae with respect to the loans it services on behalf of Fannie Mae before building the NPV model into their own platform/system or customizing the NPV Calculator.

## Q1805. Intentionally Left Blank

## Q1806. How soon after release of a new version of the Making Home Affordable NPV model must a servicer begin to use the new base NPV model?

Servicers will have a grace period to implement each new version of the Making Home Affordable (MHA) Net Present Value Base Model. The grace period for each new version will be set forth in the applicable NPV release documentation. In addition, the release documentation will provide guidance as to which NPV model version servicers should use during the grace period. After the grace period, servicers must use either the most recent version of the base MHA Net Present Value Model or a customized version that meets the requirements for customization outlined in the model documentation.

## Q1807. Will mortgage insurance (MI) be considered in the NPV model?

Yes. MI is considered in calculating the net present value of both the modified and unmodified loan. MI payments reduce investor losses in the event of a default for both of these scenarios. In addition, partial MI claims can be entered to increase the value of the modification to the investor.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q1808. I initially tested a borrower under an earlier NPV model (e.g., Version 1.5) and he passed. I received the borrower's income documentation after the next major model version was released (e.g., version 2.0). Should I retest the borrower based on verified income using the current version of the NPV model?**

No.  Servicers should test borrowers using the same major NPV model version each time the borrower is evaluated.   All previous major versions of the NPV model are available on www.HMPadmin.com so that borrowers can be tested using the same major NPV model version for each evaluation.

**Q1809. Can servicers choose the NPV model version used to test a specific borrower?**

No. New applicants to HAMP should be tested using the latest available NPV model version, and retests should use the same major model version as the initial test.

**Q1810. `REVISED` I tested a borrower using the NPV model and he passed.  Since then, I have received the borrower's income documentation.  When I retest the borrower based on verified income, which NPV inputs should I hold constant and which NPV inputs should I update?**

All NPV inputs should remain constant when the borrower is retested, except (i) those that were found to be incorrect at the time of the initial NPV evaluation and (ii) inputs that have been updated based on the borrower's documentation.  Inputs that may be updated based on the borrower's documentation are limited to the following:

    a. Association Dues/Fees before Modification
    b. Monthly Hazard and Flood Insurance
    c. Monthly Real Estate Taxes
    d. Monthly Gross Income
    e. Unpaid Principal Balance After Modification (interest-bearing UPB)
    f. Principal Forbearance Amount
    g. Interest Rate After Modification
    h. Amortization Term After Modification
    i. Principal and Interest Payment After Modification

Inputs that may not change regardless of their evolution since the trial's initiation include:

    a. Unpaid Principal Balance Before Modification
    b. Borrower FICO and Co-borrower FICO
    c. Property Value
    d. Interest Rate Before Modification
    e. Term Before Modification
    f. Monthly Principal and Interest Payments Before Modification
    g. Months Past Due
    h. ARM Reset Rate and ARM Reset Date
    i. Data Collection Date
    j. Imminent Default Status
    k. NPV Run Date
    l. Advances/Escrow
    m. Discount Rate Risk Premium (spread of discount rate over PMMS rate)

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q1811.** [NEW] **The weekly PMMS rate is published mid-day on Thursdays. When should the new rate be implemented in the NPV model?**

Servicers should implement the new PMMS rate to be effective at 12:01 AM ET on the day following publication of the rate. The rate is normally published mid-day Thursdays and should therefore be updated at 12:01 AM ET on Friday morning. If the rate is published on another day such as Wednesday, as has occurred when Thursday was a holiday, the rate should be updated at 12:01 AM on the day following publication. This is consistent with when the PMMS rate is updated on the NPV model available on www.HMPadmin.com.

Notwithstanding the above, loans being retested for NPV should always utilize the same PMMS rate utilized during the first NPV run.

## J.    Reporting Requirements

**Q1900. When will reporting requirements, including the key data points, be available for servicers? What type of reporting format/medium will be required?**

Servicers must begin providing loan level data to Fannie Mae, the program administrator, when a HAMP loan enters a trial period. Details on the required loan level data for these reporting requirements are provided in the "HAMP Data Dictionary" available at www.HMPadmin.com.

**Q1901. What date should be reported by the servicer for the Interest Rate Lock Date for Modification in the trial period set up file and in the loan set up file?**

The Interest Rate Lock Date for Modification is the date that the Interest Rate Cap for a modified mortgage loan is determined. For trial set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate used to determine eligibility for HAMP when establishing the interest rate terms in the standard waterfall process for the trial period payment under the trial period plan. For loan set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly PMMS Rate used to establish the interest rate terms in the standard waterfall process for the modification payment under the Modification Agreement. As specified in *Servicing Guide* Announcement 09-05R, the Freddie Mac Weekly PMMS Rate used for the modification payment should be the rate, rounded to the nearest 0.125 percent, in effect as of the date that the Modification Agreement is prepared.

**Q1902. If the servicer does not have the property condition from an appraisal or BPO, what should the servicer enter in the "property condition" field in IR2?**

The servicer should enter "3" (Fair) when they don't have a property condition from an appraisal or a BPO, provided the property meets HAMP eligibility requirements. Servicers must enter "5" if the property is condemned. When servicers enter "3" because they don't have a property condition from an appraisal or a BPO: (i) the "property condition" field in IR2 may not be relied on by the servicer as a justification or presumption that the loan qualifies for HAMP and that any subsequent payout based on the information in IR2 does not constitute a waiver on the part of the investor and/or Treasury who reserves all rights to seek reimbursement of an improper payout or repurchase of the loan in the event the property does not meet HAMP eligibility requirements; and (ii) the "property condition" field in IR2 may not be relied on by the investor as grounds for repurchase of the loan due to a breach of a representation and warranty related to the property condition.

**Q1903.** **What should a servicer do if its servicing system will not report to credit bureaus based on the due date of the trial period payment as stated in the Trial Period Plan cover letter, but instead reports based on the contractual due date?   If the servicer cannot follow the process, can it delete the specific language in the cover letter regarding credit reporting?**

As outlined in *Servicing Guide* Announcement 09-05R, if a borrower is current prior to entering the trial period, servicers are required to report to the credit bureaus that the borrower is current but on a modified payment if the borrower makes timely trial period payments by the 30th day of each trial period month, as well as report the modification when completed. If the servicer's servicing system will not allow them to report in this manner, servicers may edit the Trial Period Plan cover letter to accurately describe the servicer's practice related to credit bureau reporting. Note: The new Trial Period Plan Notice does not contain detailed language related to credit bureau reporting practices.

**Q1904.** **The IRS Form 1098 does not contain the UPB for the applicable loan.  In the case of a loan with a principal forbearance, would it be an accurate assumption that a notation is not necessary on the 1098 to remind the borrower of the principal forbearance?**

Yes.

**Q1905.** **If the servicer utilizes an IRS-compliant Annual Borrower Statement that includes the UPB of the modified loan as a substitute 1098 and the loan has principal forbearance, is it necessary to state the principal forbearance amount on the statement?**

Yes.   Any borrower statement that includes the unpaid principal balance of the loan must include the principal forbearance amount, if applicable.

## K.    Trial Period

**Q2000.** **Must foreclosure be suspended during the trial period?**

Except in "foreclosure restart states" as described in Q2002 below, any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period. Foreclosure actions may not be initiated or restarted until the borrower has failed the trial period and the borrower has been considered and found ineligible for other available foreclosure prevention options.

**Q2001.** **What is success or failure under a trial period plan?**

The trial period plan is considered to be successful if the borrower has made all of the trial period plan payments no later than the last business day of the month in which the last trial period plan payment is due, the borrower has provided all required documentation, the borrower has complied with all other requirements of the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct.   If the servicer has not received all trial period plan payments or required documentation by this deadline or determines the borrower has not otherwise complied with the trial period plan, the borrower has failed the trial period and is not eligible for a permanent loan modification under HAMP.   The servicer must consider the borrower for other foreclosure prevention alternatives, including pre-foreclosure sales and deeds in lieu of foreclosure, as appropriate.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q2002. What rules apply to loans that were in active foreclosure in foreclosure restart states prior to initiation of the trial period plan? Will borrowers be considered to have failed the trial period plan if they are not current at the time the foreclosure sale is scheduled? How could such borrowers be current if foreclosure was already in process?**

Due to unique foreclosure law requirements in Georgia, Hawaii, Missouri, and Virginia, borrowers in these states who were in active foreclosure prior to executing a trial period plan will be considered to have failed the trial period plan and servicers may proceed with the foreclosure if either (a) the servicer determines that the borrower made a misrepresentation under Section 1 of the Trial Period Plan or (b) the borrower has not made all required trial period payments through the end of the month preceding the month in which the foreclosure sale is scheduled to occur.

**Q2003. When a borrower is placed in a trial period plan, does the loan information need to be changed on the servicer's system and Fannie Mae's system to reflect the trial period terms?**

No. Scheduled loan terms in servicing systems should not be modified during the trial period. However, servicers must follow the requirements for reporting to the credit reporting agencies during the trial period as set forth in *Servicing Guide* Announcement 09-05R and discussed below in Q2004.

**Q2004. How should borrower payments be reported to credit reporting agencies during the trial period?**

Servicers should continue to report a "full file" status report to the four major credit reporting agencies while evaluating a borrower for program eligibility and during the trial period plan. If a borrower is current when they enter the trial period, the servicer should report the borrower current but on a modified payment if the borrower makes timely payments by the last business day of each trial period month at the modified amount during the trial period. If a borrower is delinquent when they enter the trial period, the servicer should continue to report in such a manner that accurately reflects the borrower's delinquency and workout status following usual and customary reporting standards.

In both cases the servicer should report the modification when it becomes final.

**Q2005. If the borrower fails during the trial period, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q2008.

**Q2006. If the borrower makes the first trial period payment before the servicer prepares the Trial Period Plan, and the borrower never returns a signed Trial Period Plan, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q2008.

**Q2007. If the servicer prepared a trial period plan based on the borrower's stated income information and, upon receipt of the income documentation, discovers that the original trial period plan was out of tolerance, can the borrower be provided with another offer under HAMP?**

Deleted. Refer to Q2008.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q2008. Is a borrower who has received a HAMP offer eligible for a subsequent HAMP offer? When is a servicer's obligation to offer a borrower a HAMP modification considered satisfied?**

A borrower who has received a HAMP offer is ineligible for a subsequent HAMP offer, and the servicer's obligation to offer the borrower a HAMP modification is considered satisfied, in the following circumstances:

- the borrower received a HAMP modification and lost good standing, or
- the borrower received a HAMP offer and made the first payment under trial period plan, but did not (i) make all required payments by the end of the trial period, or (ii) provide all required documents by the end of the trial period.

A borrower who has received a HAMP offer may, with the prior written consent of Fannie Mae , be eligible for a subsequent HAMP offer, and the servicer's obligation to offer the borrower a HAMP modification is considered satisfied, in the following circumstances:

- the borrower received a HAMP offer, but did not make the first trial period payment by the end of the month in which it was due, or
- the borrower received HAMP offer, but did not provide all required documents within 60 days of the offer.

**Q2009. Can the borrower accelerate his or her modification effective date by making his or her trial period payments earlier than scheduled?**

No. There is no variation to this rule.


## L.     Valuation

**Q2100. Why is an appraisal, broker price opinion (BPO), or automated valuation model (AVM) generated property valuation necessary and when does such a valuation become stale?**

The appraisal, BPO, or AVM-generated property valuation is an input to the NPV calculator. Pursuant to *Servicing Guide* Announcement 09-31, the valuation must be less than 90 days old on the NPV submission date. The information will remain valid for the duration of the trial period and does not need to be updated for any subsequent NPV evaluation.

**Q2101. What is considered a reliable confidence score for an AVM?**

Servicers relying on their internal AVM should establish reasonable confidence scores. Confidence scores that are deemed reasonable by bank examiners are also considered reasonable for purposes of this program. For Fannie Mae's AVM, a confidence score of 1 through 4 constitutes a reliable confidence score for use with the NPV model. Freddie Mac will communicate guidance on what constitutes a reasonable confidence score under its AVM.

**Q2102. If a broker price opinion (BPO) is utilized, will an exterior inspection be sufficient or is an interior/exterior inspection with photos required?**

Where BPOs are utilized, exterior-only inspections are sufficient.

## M.   Verification

**Q2200. If one of the borrowers on the loan is non-responsive (will not supply income documentation and will not sign a Home Affordable Modification Agreement), can the HAMP modification proceed with the remaining borrower who is residing in the household, as long as the HAMP modification does not have to be recorded (i.e., capped amount under $50,000)?**

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representative(s) must execute the HAMP documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAMP documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity, military deployment, etc.

**Q2201. Can HAMP be considered for a borrower that is temporarily displaced (e.g., incarceration, temporary foreign service assignment, military service, etc.) from his/her home if s/he is the only borrower on the original loan documents but an occupant, who is not on the loan, is still living in the property as a primary residence?**

If the borrower was occupying the property as his or her principal residence immediately prior to his or her displacement, intends to occupy the property as his or her principal residence upon his or her return and the current occupant is not a tenant, the mortgage loan is eligible for consideration under HAMP. The servicer must confirm the borrower's occupancy representations as set forth in *Servicing Guide* Announcement 09-31.

**Q2202. Is extinguishment of a second lien required under HAMP?**

No. Extinguishment of second lien instruments is not a requirement of HAMP.

**Q2203. Please clarify the definition of non-borrower household income. Who is a non-borrower?**

A non-borrower is someone who is not on the original note (and may or may not be on the original security instrument), but whose income has been relied upon to support the mortgage payment. Non-borrower household income that may be considered for HAMP qualification must come from someone who resides in the residence. Examples include a non-borrower spouse, parent, child or a non-relative, but in each case, a person who shares in the occupancy of the home and provides some support for the household expenses.

**Q2204. What information must a borrower provide to document unemployment benefit income (UI)?  What resources exist to allow a servicer to verify this unemployment insurance benefit information?**

Borrowers must document the amount, frequency and duration of the unemployment benefits. This information is typically obtained through official UI benefit documentation (the "Monetary Determination Letter").   Note that the Monetary Determination Letter does not include exceptional state benefit extensions and federally funded benefit extensions; therefore the total duration of the borrower's UI eligibility is not reflected in the "Maximum Benefit Amount" field of the Monetary Determination Letter.

To determine the total length of time an unemployed borrower may continue receiving payments – including federal and state-specific extensions – the servicer may use the Department of Labor UI benefit tool which is available at http://www.ows.doleta.gov/unemploy/ben_entitle.asp. If this tool is used, a screen shot of the output should be included with the loan file.  Information

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

about the length of benefit eligibility for workers qualifying for Trade Adjustment Assistance can also be found at the above Web site.

**Q2205. Is a borrower who is unemployed with six months of unemployment benefits remaining and the ability to file for an extension extending benefits beyond the required nine months eligible for HAMP?**

If the servicer makes a reasonable determination that the borrower is eligible to file for an extension for the unemployment benefits, and the extension would extend to or beyond nine months from the servicer's initial evaluation of the borrower for HAMP eligibility, such unemployment income is eligible to be included when qualifying the borrower for HAMP. The borrower must also meet all other HAMP eligibility criteria.

**Q2206. How should the borrower's "pay for performance" incentive be treated for tax reporting purposes?**

The IRS has ruled that the borrower's "pay for performance" principal balance reduction payment will be excluded from gross income for tax reporting purposes.

**Q2207. Is it permissible for a servicer to require a delinquent borrower to make a "good faith" or contribution payment pending the processing of the trial period plan before the plan starts?**

No, servicers may not require the borrower to make a "good faith" or contribution payment.

**Q2208. May a servicer accept information provided on behalf of borrowers by trusted advisors such as HUD-approved housing counselors?**

Yes. Servicers should accept borrower information delivered by an authorized trusted advisor on behalf of a borrower and may use that information to determine HAMP eligibility. In such cases, the servicer must comply with applicable privacy and other laws and, when necessary, obtain evidence of the borrower's consent to the servicer's sharing of the borrower's private financial information with the trusted advisor.

Servicers may pledge any portion of the upfront servicer incentive that is earned in conjunction with a completed HAMP modification to compensate trusted advisors acting on behalf of a borrower, provided that there is no fee charged to the borrower.

**Q2209. If there are changes in a borrower's tax and insurance premium payments during the trial period (but after a verified approval), must the servicer re-evaluate the borrower for HAMP eligibility and obtain a new NPV result?**

No, the servicer is not required to re-evaluate the borrower for HAMP eligibility or obtain a new NPV result after the eligibility determination based on verified income documentation. However, the servicer must provide written notice to the borrower – in addition to any escrow notification required by RESPA – which explains the impact of the new escrow payment on the trial period plan.

## N.   Standard Modification Waterfall Questions

**Q2300. Please clarify the servicer's obligation as it relates to the HOPE for Homeowners (H4H) requirement.**

While the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to

© 2010 Fannie Mae. Trademarks of Fannie Mae.
Revised - FM 02/25/10
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

refinance through an FHA H4H loan. This assessment would involve asking the following set of questions:

- Will the loan amount exceed $550,440?
- Has the borrower made less than 6 full payments during the life of the first lien loan?
- Does the borrower have an ownership interest in other residential real estate (including 2nd homes/rental properties)?
- Was the mortgage to be refinanced originated after January 1, 2008?
- Does the property contain more than 1 unit?

If the answer to all of these questions is "NO," the borrower may be eligible for H4H. In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender. If the servicer's origination division does not participate in the H4H program, a listing of participating lenders can be found at the following link:

http://portal.hud.gov/portal/page?_pageid=73.7605762&_dad=portal&_schema=PORTAL

If the servicer knows that the related owner or third party investor does not permit principal forgiveness, which is required under H4H, no servicer action is required with respect to that loan. However, the servicer may not refuse to consider a borrower for HAMP or refuse to initiate a trial period plan for an otherwise qualified borrower subject to that borrower applying for and being denied a loan under H4H.

Servicers should demonstrate compliance with this requirement by documenting the date of the referral. Servicers are not – under any circumstances – required to take a loan application from the borrower.

## Q2301. Intentionally Left Blank

## Q2302. May a servicer extend the term before reducing the interest rate if the servicer believes the outcome is better for the borrower?

Servicers must follow the waterfall steps sequentially as outlined by *Servicing Guide Announcement 09-05R*. The interest rate must be fully reduced to 2 percent prior to any term extension. However, servicers are not precluded under HAMP from agreeing to a modification where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31 percent, as long as the modification otherwise complies with HAMP requirements. In this case, borrower, servicer and investor incentive / reimbursement payments will be paid on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

## Q2303. Can servicers agree to a rate below 2 percent or fix the reduced rate for the life of the loan?

Servicers must request written approval from Fannie Mae prior to agreeing to a HAMP modification where the interest rate is less than 2 percent or does not step up after five years. In any event, borrower and servicer incentive payments for these modifications will be paid based on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

## Q2304. Intentionally Left Blank

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q2305. Where can the servicer obtain the Freddie Mac Primary Mortgage Market Survey rate?**

The Freddie Mac Primary Mortgage Market Survey rate (PMMS) is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin. The weekly PMMS rate is available on the Freddie Mac home page at www.freddiemac.com.

**Q2306. Intentionally Left Blank**

**Q2307. If subordination of a junior lien holder is required and that junior lien holder imposes a fee or cost reimbursement requirement, can the servicer pay the item and capitalize the amount?**

The servicer may not capitalize junior lien holder subordination fees. Servicers are not required, but may choose to pay those fees out of pocket and offset costs out of their incentive payments.

**Q2308. If a loan was modified in the past and has a principal/interest forbearance tied to the previous modification, can that previous forbearance amount be capitalized?   How should that balance be handled?**

Any prior forbearance amount may be capitalized to the extent that such forbearance is permitted under, and any required disclosures comply with, all applicable laws, rules and regulations.

**Q2309. If the NPV test is "negative" and the servicer cannot reduce the borrower's payment to achieve the 31 percent target monthly mortgage payment ratio, can the servicer still modify the loan under HAMP (for example, to a 35 percent monthly mortgage payment ratio) and receive the HAMP incentives?**

If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy the HAMP requirements and no incentives will be payable in connection with the modification. However, the servicer should consider all other loss mitigation options that may be available based on investor guidelines and contractual agreements.

**Q2310. Intentionally Left Blank**

**Q2311. Is a borrower with a mortgage loan that has a current remaining term (prior to modification) that is greater than 480 months eligible for a HAMP modification?**

Yes. The fact that the loan's current remaining term is greater than 480 months does not disqualify the borrower from HAMP eligibility.  If the borrower is otherwise eligible under HAMP and reduction of the borrower's current interest rate to two percent would not be sufficient to reach the target monthly mortgage payment ratio of 31 percent, the servicer should skip the term extension step of the standard modification waterfall and proceed to the principal forbearance step of the waterfall to attempt to achieve the target monthly mortgage payment ratio of 31 percent.  The servicer should enter the remaining term in the NPV input field labeled "Amortization Term after Modification" so that the number in this field and the "Remaining Term" NPV input field are identical.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q2312.** **NEW** **If the current mortgage rate (or the ARM reset rate, if applicable) is not at a 1/8th percentage-point increment, how should the rate reduction step proceed?  Should the rate be rounded down to the nearest 1/8th percent first before proceeding to full 1/8th percentage-point reductions, or should the rate reduction begin with the un-rounded rate?**

Do not round the interest rate first.  Begin with the un-rounded rate and reduce it in 1/8th percentage-point increments until the target monthly mortgage payment ratio is achieved. Upon reaching the point where a further 1/8th percentage-point increment will reduce the rate below 2%, set the rate to exactly 2% with no term extension and determine if the target monthly mortgage payment ratio is achieved.  If it is not, move to the next step of the waterfall (term extension).

For example, test for the target monthly mortgage payment ratio at 2.180%; if it is not achieved, reduce the rate to 2.055% and test again; if it is not achieved, reduce the rate to 2.000% and test again; if it is not achieved, fix the rate at 2.000% and move to the term extension step of the waterfall.

**Q2313.** **NEW** **What is the required waterfall modification increment for term extension?**

The term extension steps must be made in one-month increments.

**Q2314.** **NEW** **When should the servicer run the NPV test?  When should the servicer run the waterfall?**

Servicers should use the base NPV model to qualify borrowers for HAMP at the following stages of the HAMP modification process:

1. If applicable, when assessing the borrower's eligibility for a HAMP modification based on verbal income information from the borrower.

2. When assessing the borrower's eligibility for a HAMP modification based on borrower information that has been verified using the borrower's required documentation.  Trials initiated based on information verified using complete documentation do not require multiple NPV tests.

Servicers are reminded, pursuant to _Servicing Guide Announcement 09-31,_ to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation

Because outputs from the HAMP modification waterfall are used as inputs to the base NPV model, servicers must perform the modification waterfall prior to each of the NPV runs above, while holding certain inputs constant per Q1810.  Separately, servicers must perform a final standalone waterfall analysis in order to obtain final HAMP modification terms for inclusion in the Home Affordable Modification Agreement, and servicers are encouraged to do so after receipt of the second to last trial period payment.  The NPV model should not be run at this time.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

## O.   Incentives and Payments

**Q2400. What does it mean to be in good standing?**

A borrower is considered to be in good standing under the program if they are not delinquent by the equivalent of three full monthly payments at the end of the month in which the last of the three delinquent payments was due.

**Q2401. If there is a 30-60 day delinquency during the year, will the incentive payments still accrue?**

Borrower "pay for success" principal balance reduction payments will accrue as long as the borrower is current and makes his or her monthly payment on time (the payment is made by the last day of the month in which the payment is due). For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the loan is in good standing at the time the annual incentive is paid. A borrower whose loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

Servicer "pay for success" fees will be paid annually as long as the loan is in good standing at the time the annual incentive is paid.

**Q2402. How does a borrower lose good standing?**

If a borrower misses three payments following execution of a HAMP (three monthly payments are due and unpaid on the last day of the third month), the loan is no longer considered to be in "good standing". A loan that is not in good standing permanently loses eligibility to receive further incentives and reimbursements under the program. Undisbursed payments to borrowers, servicers and investors, even if accrued, will not be made. Once lost, good standing cannot be restored and eligibility for incentives and interest reimbursements cannot be reclaimed, even if the borrower fully cures the delinquency.

**Q2403. Is a borrower that has failed a HAMP modification eligible for another HAMP offer?**

No. A borrower that fails a HAMP modification is not eligible for another HAMP offer. However, the servicer must work with the borrower to attempt to cure the delinquency. If a cure is not possible, the servicer must consider the borrower for any other home retention loss mitigation options that may be available. If those options are unsuccessful, the servicer must consider the borrower for a short sale or deed-in-lieu when applicable.

**Q2404. In what form will the incentive payments be paid – physical checks or wires? Will they be by individual loan or consolidated? If consolidated, will Fannie Mae provide loan-level accounting for the incentives? Are there any differences in payment method between Fannie Mae, Freddie Mac and non-GSE?**

Incentive payments for all modifications, whether held by Fannie Mae, Freddie Mac or non-GSE investors, will be paid via wire transfer in a consolidated fashion. Fannie Mae will provide loan-level accounting for the incentives.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

**Q2405. If a borrower receives a modification under HAMP and pays the loan off early, would the borrower subsequently receive his or her accrued incentive for the months in which he or she performed (e.g., the borrower pays off the mortgage before the anniversary date of the beginning of the trial period, but had accrued several months of incentive)? Would a servicer receive any incentive payment?**

Incentives, including accrued but unearned incentives, will not be paid to any party after the loan is paid in full.

**Q2406. For GSE loans, do the respective Announcements, Bulletins, and Guide chapters published by either Fannie Mae or Freddie Mac constitute part of the "guidelines issued by the Secretary of the Treasury or his designee under the Emergency Economic Stabilization Act of 2008" for purposes of determining the scope and availability of the Servicer Safe Harbor for Mortgage Modifications as set forth in section 201 of the Helping Families Save Their Homes Act of 2009?**

Yes. In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Fannie Mae ("Fannie Mae Mortgages") must service Fannie Mae Mortgages in accordance with Fannie Mae *Servicing Guide* Announcement 09-05R and any related announcement published by Fannie Mae governing the implementation of HAMP with respect to Fannie Mae Mortgages. In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Freddie Mac ("Freddie Mac Mortgages") must service Freddie Mac Mortgages in accordance with the Freddie Mac Seller/Servicer Guide, Chapter C65 and any related Bulletins published by Freddie Mac governing the implementation of HAMP with respect to Freddie Mac Mortgages.

**Q2407. Fannie Mae and Freddie Mac appear to have a slightly different benchmark for imminent default. Is Fannie Mae's intent to base the imminent default definition on the MBA definition of "30 days delinquent" or based on calendar days? Freddie Mac?**

Fannie Mae and Freddie Mac intend to require the imminent default screen for all loans that are less than one payment delinquent under the MBA delinquency definition.

Both Fannie Mae and Freddie Mac consider a loan one payment delinquent if the payment that was due on the first of the month has not been received by the last day of the month. For example, if a February 1 payment has not been received before the Servicer's cut-off time for posting payments on February 28, the loan is one payment delinquent. Further, if a March 1 payment has not been received before the Servicer's cut-off time for posting payments on March 31, the loan is one payment delinquent.

**Q2408. Intentionally Left Blank**

**Q2409. If a borrower's "pay for performance" incentive is due to be paid when the borrower is delinquent, should the servicer apply the payment as a principal curtailment?**

In the event the borrower is delinquent, but still in good standing, the borrower's incentive should continue to be applied as a curtailment to the interest-bearing UPB.

## P.   Government Monitoring Data

**Q2500. What information are servicers required to collect?**

Servicers must request information regarding the race, sex, and ethnicity (Government Monitoring Data) of any borrower (including any co-borrower) who seeks a modification under HAMP.

**Q2501. Why does the federal government need the Government Monitoring Data?**

In the federal Fair Housing Act, Congress prohibited discrimination in the sale and financing of housing and charged HUD with administering the Fair Housing Act. HUD requests the data in order to ensure that HAMP modifications are conducted in compliance with the Fair Housing Act. Under the Fair Housing Act, neither note holders (including Fannie Mae) nor their servicers may discriminate against any person seeking a modification under HAMP on the basis of race, national origin, sex, or any other prohibited basis.

HUD has entered into an agreement with Fannie Mae to require servicers of Fannie Mae loans to request and collect the Government Monitoring Data. Fannie Mae will report the Government Monitoring Data it collects to HUD in order to enable HUD to administer the Act.

**Q2502. When are servicers required to begin collecting and reporting Government Monitoring Data?**

Fannie Mae servicers should refer to the guidance provided in Supplemental Directive 09-06 located at www.HMPadmin.com with respect to the collection and reporting of Government Monitoring Data.

**Q2503. At what point in the HAMP process is the requirement to request Government Monitoring Data triggered, and how should servicers request Government Monitoring Data from the borrower?**

Government Monitoring Data must be requested when servicers receive a modification request under HAMP from the borrower. A request will be considered to have been received once the borrower has furnished the servicer with either a Hardship Affidavit (Rev. April 2009 or later) or an MHA Request for Modification and Affidavit form ("RMA"). Servicers should request the Government Monitoring Data as follows:

(a)   *If the borrower completes* the Hardship Affidavit or RMA in a face-to-face setting, by mail or over the Internet, the borrower will be able to read the disclosure contained just beneath the Information for Government Monitoring Purposes section heading, determine whether he or she wishes to furnish the Government Monitoring Data, and complete the remainder of the Information for Government Monitoring Purposes section accordingly. "Complete" means either furnish the requested Government Monitoring Data or check the box which states "I do not wish to furnish this information".

(b)   *If the servicer is gathering the information necessary to complete* the Government Monitoring Data from the borrower in a face-to-face interview or over the phone, the servicer should first read to the borrower the disclosure contained just beneath the Information for Government Monitoring Purposes section heading. This will inform the borrower that the federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers based on the borrower characteristics collected in the Government Monitoring Data. It will also inform the borrower that if he or she chooses not to provide the Government Monitoring Data, then, where the Hardship Affidavit or RMA is taken in person, the servicer is required to note the data on the basis of visual observation or surname. After reading the disclosure to the borrower, the servicer should ask the borrower whether he or she desires to furnish the information. If the borrower elects to furnish the Government Monitoring Data, the servicer should read the race, ethnicity and sex categories and options from the Information for Government Monitoring Purposes section, ask the borrower which boxes he or she would like checked, and then check the boxes as directed by the borrower. If the borrower declines to furnish the information, see Q2506 below.

© 2010 Fannie Mae. Trademarks of Fannie Mae.

The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

While servicers *must ask and encourage* each borrower who completes a Hardship Affidavit or RMA to furnish the Government Monitoring Data, servicers *may not require* the borrower to furnish the Government Monitoring Data.

**Q2504. What response should a servicer provide when asked by a borrower why the Government Monitoring Data is requested?**

Servicers should ensure that their servicing staff and managers understand the importance of requesting that HAMP participants provide the Government Monitoring Data. The federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers on the basis of race, ethnicity and sex. In instances where borrowers decline to provide the information, servicing staff should be provided with training and job aids, e.g., desk references, scripts and, where feasible, system prompts, to supply this information as described below in Q2509.

Additionally, servicers should ensure that their internal quality control plans include procedures for monitoring compliance with these requirements regarding the request for Government Monitoring Data.

**Q2505. What if the borrower declines to provide the Government Monitoring Data?**

If a borrower declines or fails to furnish all or part of the Government Monitoring Data, either the servicer or the borrower should note that fact on the Hardship Affidavit or RMA.

(a) If the *borrower completes* the Hardship Affidavit or RMA in a face-to-face setting and chooses not to furnish the Government Monitoring Data, he or she should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the borrower chooses not to check the box, the servicer should note this fact on the form. See question Q2506 below for further guidance on providing the Government Monitoring Data based on visual observation or surname.

(b) If the borrower completes the Hardship Affidavit or RMA by mail, telephone or over the Internet, he or she should check or direct the servicer to check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the borrower chooses not to furnish the data or check the box, the servicer should indicate in the appropriate spaces within the Information for Government Monitoring Purposes section that the Hardship Affidavit or RMA was received by mail, telephone, or Internet and note the fact that the borrower chose not to furnish the Government Monitoring Data.

(c) If the borrower furnishes the hardship information to the servicer as *the servicer completes* the Hardship Affidavit or RMA in either a face-to-face interview or over the phone, and the borrower elects not to furnish the Government Monitoring Data, the servicer should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the servicer is completing the Hardship Affidavit or RMA over the phone, note that fact in the appropriate space within the Information for Government Monitoring Purposes section.

**Q2506. If the borrower declines to provide the Government Monitoring Data, must servicers provide it?**

If a borrower declines to provide the Government Monitoring Data, servicers must attempt to provide it if the Hardship Affidavit or RMA is completed in a *face-to-face meeting* with the borrower (either by the borrower or by the servicer based on information gathered from the borrower during the interview). In that situation, servicers should note the borrower's race, ethnicity and sex, but only to the extent possible on the basis of visual observation or surname.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

If the borrower declines to provide the Government Monitoring Data or fails to provide the information on a Hardship Affidavit or RMA taken by *mail, telephone or over the Internet*, the data need not be provided.

**Q2507. If the borrower declines to provide the Government Monitoring Data in connection with a request for modification but a servicer has race, ethnicity and sex data in its system that was obtained at the time of loan origination, should the servicer complete the Hardship Affidavit or RMA using the original race, ethnicity and sex data?**

If the servicer has reasonable access to Government Monitoring Data supplied by the borrower at origination and the borrower and co-borrower remain the same, the servicer is required to provide that information.

**Q2508. If servicers have race, ethnicity and sex data in their systems obtained at the time of loan origination, should the original data be replaced with the Government Monitoring Data from the Hardship Affidavit or RMA?  Should servicers amend any HMDA reporting for the year in which the loan origination occurred?**

This is a question that should be directed to the servicers' counsel or compliance expert.

**Q2509. If a servicer has not asked for Government Monitoring Data in connection with a modification request it has already received, does the servicer need to contact the borrower to request the Government Monitoring Data now?**

Yes. The servicer should contact the borrower and ask him or her to furnish the Government Monitoring Data prior to completing the modification if the monitoring information is required and the servicer failed to request it.  There are several ways the servicer can make the request. They include:

(a)    Mailing to the borrower either (i) a blank Hardship Affidavit or RMA containing the Information for Government Monitoring Purposes section, or (ii) an exact copy of the Information for Government Monitoring section of the Hardship Affidavit or RMA.  The servicer should request that the borrower read and complete the Information for Government Monitoring Information Purposes section and mail the form back to the servicer.  The servicer should inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it.  If the servicer mails the entire Hardship Affidavit or RMA, the servicer is encouraged to strike through all sections of the Hardship Affidavit or RMA (including the signature lines) except for the Information for Government Monitoring Purposes section in order to avoid confusion and rework on the part of the borrower.  Either mailing should include a cover letter describing the intended use and importance of the Government Monitoring Data and encouraging the borrower to provide it.  Servicers should also either provide a self addressed postage paid envelope for return of the form, or should provide a toll free number and/or internet address that the borrower may use to supply the data.

(b)    Telephone the borrower and request the Government Monitoring Data by following the guidance furnished in Q2503 above.  As indicated in Q2503, in requesting the Government Monitoring Data by phone, the servicer must use the exact text from the Information for Government Monitoring Purposes section on page two of the revised Hardship Affidavit or RMA form to request and record responses from the borrower and any co-borrower.  The servicer should also develop a script for use by their servicing staff to encourage borrowers to voluntarily furnish the Government Monitoring Data request.

(c)    Send by e-mail or make available to the borrower through a website, access to a digital online form or a .pdf copy of either (i) the Hardship Affidavit or RMA containing the

Information for Government Monitoring Purposes section, or (ii) the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA only. The format and text of any electronic or digital version of the Information for Government Monitoring Purposes section must be identical to that found in the Hardship Affidavit or RMA. Be sure to request that the borrower read and complete the Information for Government Monitoring Purposes section and, as appropriate, either submit to the servicer electronically or print and mail the completed form back to the servicer.

The servicer's email or website should explain the intended use and importance of the Government Monitoring Data and encourage the borrower to provide it. It should also inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it. If the servicer makes available the entire Hardship Affidavit or RMA, the servicer is encouraged to emphasize to the borrower that only the Information for Government Monitoring Purposes section should be completed. In the event the servicer makes an electronic version of the Hardship Affidavit or RMA or the Information for Government Monitoring Purposes section available to the borrower, the servicer must comply with all applicable privacy, data security, disclosure and other laws and regulations.

**Q2510. If the prior version of the Hardship Affidavit or RMA (which did not contain the Information for Government Monitoring Purposes section) has been completed and signed by the borrower, does a servicer need to ask the borrower to complete the current version of the Hardship Affidavit or RMA (Rev. April 2009 or later), in whole or in part?**

Yes. Prior to the completion of the modification the servicer should ask the borrower to complete only the Information for Government Monitoring Purposes section of the current version of the Hardship Affidavit or RMA. See Q2509 above for three ways in which a servicer may make the request. However, please note that when asking the borrower to complete the form, the servicer should clearly instruct the borrower not to complete or sign the remaining portions of the current version of the Hardship Affidavit or RMA.

**Q2511. Will Freddie Mac, in its capacity as Compliance Agent for the Treasury, monitor servicer compliance with collection of Government Monitoring Data?**

Yes. Freddie Mac is currently developing its compliance and monitoring protocol which will include monitoring of servicers with respect to requests for and the collection and reporting of Government Monitoring Data.

**Q2512. Does a servicer have the legal authority to request Government Monitoring Data from borrowers?**

The Federal Reserve Board regulations interpreting ECOA permit the collection of information on the race, ethnicity and sex of borrowers when the information is "required by a[n] . . . agreement . . . entered into with . . . an enforcement agency . . . to monitor or enforce compliance with [ECOA], this regulation, or other federal or state statutes or regulations." 12 C.F.R. 202.5(a)(2). HUD has requested the collection of the data pursuant to its obligation to enforce the Fair Housing Act.

HUD has the authority to request monitoring data from Fannie Mae and servicers. See the Federal Housing Enterprises Financial Safety and Soundness Act ("FHEFSSA") at 12 U.S.C. § 4545(2), 12 C.F.R. 202.5(a)(2), and generally under the Fair Housing Act at 42 U.S.C. 3601 et seq.

HUD is using these authorities to direct Fannie Mae to collect monitoring data. HUD is also using these authorities to direct Fannie Mae to enter into agreements with servicers, on HUD's

© 2010 Fannie Mae. Trademarks of Fannie Mae.

The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

behalf, that require the servicers to request monitoring data from borrowers who request modifications under HAMP.

The announcement regarding the collection of monitoring data has been incorporated into the Mortgage Selling and Servicing Contracts (the "MSSCs") between Fannie Mae and its servicers. *See 2009 Selling Guide, Part A, Subpart A2, Chapter A2-1.* Therefore, the announcement, as incorporated in the MSSCs, constitutes a HUD-authorized agreement entered into between Fannie Mae and its approved servicers.   HUD considers any such agreements to be agreements entered into with an enforcement agency to monitor or enforce compliance with federal law, within the meaning of 12 C.F.R. 202.5(a)(2).

For more information, view the:

- Letter Agreement between HUD and Fannie Mae regarding the collection of monitoring data dated April 16, 2009;
- Fannie Mae *Servicing Guide* Announcement 09-05R; and,
- Federal Reserve Board letter to HUD and the Department of Treasury dated March 27, 2009.

If a servicer has any questions regarding its legal obligations, the servicer should consult its own counsel.

© 2010 Fannie Mae. Trademarks of Fannie Mae.
The Making Home Affordable logo is a trademark of the United States Department of the Treasury and is used under license.

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2010-04340                    SECTION "16"                    DIVISION "D"

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED:_____          _____
                                        DEPUTY CLERK

## CONSENT MOTION TO CONTINUE CURRENTLY SCHEDULED HEARING

BAC Home Loans Servicing, L.P. ("Bank of America") respectfully requests that the hearing on its Peremptory Exception of No Cause of Action, currently scheduled for Friday, November 12, 2010, be continued to Friday, December 3, 2010. Counsel for Bank of America has contacted counsel for Plaintiff, Frederick Thomas; Plaintiff has consented to this request.

WHEREFORE, Bank of America prays for the following relief:

(a) That the Court continue the currently scheduled hearing on Bank of America's Peremptory Exception of No Cause of Action to Friday, December 3, 2010.

Respectfully submitted,

_____
DANIEL T. PLUNKETT (#21822)
LAURA C. SETTLEMYER (#32247)
McGlinchey Stafford, PLLC
12th Floor, 601 Poydras Street
New Orleans, LA 70130
Telephone (504) 586-1200

ATTORNEYS FOR BAC HOME LOANS
SERVICING, L.P.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon all counsel of record by electronic transmission or by depositing same in the U.S. Mail, postage prepaid and properly addressed, this  9th  day of November, 2010.

*Laura C. Settlemyer*

LAURA C. SETTLEMYER

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2010-04340              SECTION "16"              DIVISION "D"

FREDERICK THOMAS

VERSUS

BAC HOME LOANS SERVICING, L.P.

FILED:_____     _____
                                   DEPUTY CLERK

<u>ORDER</u>

**CONSIDERING THE FOREGOING** Consent Motion to Continue Currently Scheduled Hearing:

**IT IS ORDERED** that the hearing on Bank of America's Peremptory Exception of No Cause of Action, currently scheduled November 12, 2010, be, and is hereby, continued to December 3, 2010.

**NEW ORLEANS**, Louisiana, this _____ day of November, 2010.


                            _____
                            **JUDGE**

898484.1

- 1 -